C. D. WARD, Appellant,

v.

CONSOLIDATED FOODS CORPORATION, Appellee.

No. 5115.

Court of Civil Appeals of Texas, Waco.

April 20, 1972.

Rehearing Denied May 25, 1972.

William F. Billings, Johnson, Guthrie, Billings & Pierce, Donald A. Gilley, Dallas, for appellant.

Gardere, Porter & DeHay, Dallas, for appellee.

## OPINION

JAMES, Justice.

This is a suit involving an employment agreement. Plaintiff-Appellant C. D.

Ward sued Defendant-Appellee Consolidated Foods Corporation and its division "Hollywood Brands" for damages arising out of an employment agreement, the written memorandum of which is the following letter:

"HOLLYWOOD BRANDS
Division of Consolidated Foods
Corporation, Centralia, Illinois
62801
Joseph W. Pridmore
President

July 24, 1968

Mr. C. D. Ward
7909 Nordica
Niles, Illinois

Dear C. D.:

I am delighted that you are joining Hollywood Brands. I know that you will be good for Hollywood and Hollywood will be good for you and your family.

Our agreement, as we discussed Saturday, is as follows:

1. Base Salary—$18,000

2. Annual bonus based upon divisional results up to 50% of base

You will not be compelled to retire at 65. However, if at 65 or later, it is mutually agreed that a reduction in responsibility would be appropriate we will undertake a consulting arrangement which will gross $10,000 annually. Of course, C. D., this is based on performance. Frankly, I hope you are around until you are at least 83.

Best personal regards,
/s/ Joe
Joseph W. Pridmore

JWP/ns"

At the time the above letter was written, Ward was 60 years of age and had been with Curtiss Candy Company for 25 years and had had several years experience as a plant superintendent in the manufacture of

candy and related items. In 1968 Ward was a general superintendent for Curtiss with the responsibility for the manufacturing and shipping operations over three plants in and around Chicago, Illinois. Through a consulting firm Ward was contacted and put in touch with Joseph W. Pridmore who was president of "Hollywood Brands", a division of Consolidated Foods Corporation, whose home office was in Centralia, Illinois. At this time Ward was only five years away from retirement (at age 65) and had acquired substantial "fringe benefits" with Curtiss Candy Company such as retirement benefits, health, accident, and life insurance and similar benefits.

Hollywood had a new candy manufacturing plant at Sulphur Springs, Texas, which had not at that time been put into operation, and Pridmore wanted Ward to be superintendent of this plant. Oral conferences were had between Pridmore and Ward at which Mr. Aspinall (of the consulting firm) was present, out of which the employment agreement was developed. The above letter was written to confirm the agreement and to protect Ward, in view of the fact that he was giving up his position with Curtiss Candy Company, along with his retirement, insurance and other benefits.

Pursuant to the agreement, Ward moved his family from Chicago, Illinois, to Sulphur Springs, Texas, and went to work. He found many difficulties awaiting him. Some of the equipment was used and had been purchased from a plant that was not in operation, and it would not do a job in the assembly line. Ward had trouble getting experienced supervisory personnel, and most of his labor force was inexperienced in candy manufacturing and proper sanitation practices. The design of the building was not suited for this type operation, the layout of the equipment lines were not efficient, there were cooling problems with portions of the production line, and problems with the wrapping machine. Unsuitable storage space coupled with the necessity for the storage of "scrap" or ruined candy brought about serious sanitation problems. There were also problems in the reporting procedures to the home office, as well as constant installing of equipment while candy manufacturing was going on, to the end that eventually there were three lines of production. The assembly lines began essentially with the cooking of ingredients, and went from cutting and "enrobing" (meaning covering the bar centers with a chocolate or other coating), and then to wrapping and boxing of the candy bars and preparing them for shipment. A stoppage in one place would affect the whole process.

Ward performed his duties as plant superintendent for about twenty-three months, until June 22, 1970, when he was terminated. The plant had lost money until November 1969, at which last-named month the operation was on a break-even basis as far as gross plant profit was concerned. By "gross plant profit" was meant the gross profit from the manufacturing without deduction of costs for shipping and sales. After November 1969, the profits began to increase with a general upward trend as long as figures were available to the time Ward was discharged.

During the period of Ward's tenure as plant superintendent, the plant was inspected from time to time by the Food and Drug Administration representatives (an agency of the Federal Government), by inspectors from a private agency hired by Hollywood, and by representatives from the Hollywood home office. These inspections showed sanitation problems such as rodents, insects and bird's nests in the plant and storage facilities, as well as improper sanitation practices by the employees of the plant.

An inspection of the plant was made on April 8th and 9th, 1970, pursuant to which a report was made pointing out a number of deficiencies. Appellee claims that Ward's failure to correct these deficiencies is the main reason he was fired.

Ward was due to be entitled to a bonus under his agreement on July 1, 1970; however, he was fired on June 22, 1970, eight days before his bonus would have accrued.

Meanwhile, Mr. Pridmore, the president of Hollywood, was killed in an automobile accident in March of 1970, and a Mr. Lavin was president of Hollywood at the time Ward was terminated, and was the party who actually fired Ward. At the time of the termination, Mr. Lavin made some remark to Ward to the effect that a new president usually likes to have "some of his own people" in key positions.

Trial was had to a jury, to whom seven special issues were submitted. The jury answered the first four, but were unable to agree on the last three. The jury answered the first four as follows: (1) That Ward entered into an employment agreement with Hollywood (acting through its president Joseph Pridmore) in July 1968; (2) That Ward and Hollywood (acting through Pridmore) agreed to the duration of such employment; (3) That the duration of the employment agreement was ten (10) years; and (4) That Ward in reasonable probability could have performed the duties of his employment (following his discharge) eight (8) years.

The jury became deadlocked over the following three issues:

(5) Did Hollywood have good cause to terminate Ward on or about June 22, 1970;

(6) Did Hollywood in good faith terminate Ward; and

(7) Did Ward fail to discharge his duties as directed after April 8 and 9, 1970, as plant manager.

When the trial court was certain that the jury could not answer the last three issues, he discharged the jury and then pursuant to Defendant-Appellee's motion, withdrew the cause from the jury's consideration and entered a take-nothing judgment in favor of Defendant-Appellee.

Appellant asserts four points of error; however, in the light of our disposition of Appellant's first point it will be necessary for us to discuss only his first point. Appellant contends in his first point that the trial court erred in withdrawing the case from the jury and entering judgment for the Defendant because the "letter contract" of employment was clearly intended as a contract for life, terminable for good cause only. We sustain this contention.

■ We believe the letter of July 24, 1968, expresses the clear intention that Ward's employment was for his life, subject to his being terminated for good cause. The language "Of course, C. D., this is based on performance", clearly evinces the intention that if at any time during the tenure of his employment Ward either cannot or will not perform his duties as plant manager, then Hollywood has the right to discharge him.

■ Whether the employer has "good cause" to terminate an employee is a fact question for the jury. Mr. Eddie, Inc. v. Ginsberg (Eastland Tex.Civ.App.1968) 430 S.W.2d 5, error refused NRE (see at page 10 a quoted instruction as to definition of "good cause"); Ingram v. Dallas County Water Control and Improvement District (Dallas Tex.Civ.App.1968) 425 S.W.2d 366, no writ history.

■ It is generally held that an employment contract for a definite period may not be terminated by the employer during that period "except for cause deemed good". See Hoffrichter v. Brookhaven Country Club Corporation (Dallas Tex.Civ.App. 1969) 448 S.W.2d 843, error refused NRE. This is the rule; however, in the case at bar, this condition is explicitly provided for in the letter.

■ In the instant case, the trial court withdrew the cause from the jury's consideration and entered judgment for the Defendant. In this type case we must consider the evidence that is favorable to

Ward and discard other evidence and inferences. A determination of such a question must hinge upon acceptance of the evidence and inferences therefrom in their aspects most favorable to Appellant's case, and a discarding of contrary evidence and inferences. Triangle Motors of Dallas v. Richmond (1953) 152 Tex. 354, 258 S.W.2d 60.

A careful review of the entire record reveals a substantial amount of evidence on both sides of this fact question as to whether Hollywood had good cause to terminate Ward, as shown by a resumé of the facts hereinabove stated. The trial court's withdrawal of the case from the jury and entering judgment for Defendant was error. Under such circumstances the granting of a new trial would have been proper. Rule 289, Texas Rules of Civil Procedure.

The cause is reversed and remanded to the trial court for new trial.

Reversed and remanded.