430 So.2d 1016 (1982)
Gerald W. WILEY, Plaintiff-Appellee,
v.
MISSOURI PACIFIC RAILROAD COMPANY, Defendant-Appellant.
No. 82-229.
Court of Appeal of Louisiana, Third Circuit.
October 22, 1982.
Writ Denied January 10, 1983.
Dubuisson & Dubuisson, James G. Dubuisson, Opelousas, for defendant-appellant.
*1017 Carol J. Aymond, Bunkie, for plaintiffappellee.
Before DOMENGEAUX, DOUCET and YELVERTON, JJ.
DOUCET, Judge.
This is a retaliatory dischargeconflicts of lawcase involving an injured railway worker seeking to invoke state anti-discrimination laws.
Can a railroad employee, discharged for filing (and subsequently settling) a claim under the F.E.L.A., maintain a suit for wrongful discharge pursuant to Louisiana Revised Statute 23:1361. That is the issue presented for our consideration. As far as we are aware, this is the first reported case wherein application of the aforesaid wrongful discharge provision of our workmens compensation laws has been asserted.
The trial judge summarized the facts giving rise to this suit as follows:
"... on May 9, 1979, while in the course and scope of his employment by defendant, Missouri Pacific Railroad Company, plaintiff sustained an injury. As a result of these injuries plaintiff entered into a release with the railroad in consideration of the sum of $10,000.00 being paid to him by his employer. The plaintiff was required to sign a release which expressly stated the plaintiff had resigned from the services of the railroad and that he would not thereafter be employed by that company or any of its affiliated or subsidary companies. On November 20, 1980, the railroad sent a letter to plaintiff which read as follows:
"Our records indicate that you hold seniority on the Missouri Pacific Railroad.
Your services are needed at this time; therefore, you are requested to contact this office prior to December 1, 1980.
If for any reason you are unable to do so, please furnish medical evidence of your inability to do so. If you have not marked up in the allotted time, or given evidence to why you cannot you will be considered absent without proper authority and in violation of proper instructions."
At the instigation of defendant, plaintiff was re-employed by the railroad in December of 1980 and thereafter continued to work for the railroad until he was discharged by letter dated May 1, 1981 which read as follows:
"Please refer to your letter of March 13, 1980 wherein you relinquished all employment rights with Missouri Pacific Railroad, and agreed to release all claim for back wages, lost time, etc. This letter was signed as a final settlement growing out of a personal injury sustained by you at Luling, Louisiana on May 9, 1979.
We are advised that you were erroneously allowed to return to work.
This letter is to advise you that you cannot be permitted to work for Missouri Pacific Railroad again in any capacity, due to your final settlement dated March 13, 1980."
After trial on the merits, the trial court rendered judgment in favor of plaintiff, Gerald W. Wiley, awarding $21,421.40, representing one year's earnings plus attorney's fees in the sum of $3,500.00, pursuant to La.R.S. 23:1361. From that judgment defendant Missouri Pacific Railroad Company has appealed, specifying the following alleged errors:[1]

"1.
`The trial judge erred in holding that R.S. 23:1361 applied to a previous assertion of a claim under the Federal Employer's Liability Act.

2.
The trial judge erred in holding that plaintiff was discharged from his employment because of having asserted a previous claim under the Federal Employers' Liability Act.

3.
The trial judge erred in not holding that the provisions of R.S. 23:1361 are unconstitutional *1018 if applied to previous claims asserted under the Federal Employers' Liability Act on the ground that such provisions would constitute state legislation in a field of law pre-empted by laws passed by the Congress of the United States of America.

4.
The trial Judge erred in failing to hold that the provisions of R.S. 23:1361 would be unconstitutional if applied to previous assertion of claims under the Federal Employers' Liability Act on the ground that the Act would then be broader than its title."
The historical development of the employment relationship, leading up to the wrongful discharge action, was succinctly summarized in Pugh v. See's Candies, Inc., 116 Cal.App.3d 311,171 Cal.Rptr. 917 (1981), as follows:
"The law of the employment relationship has been, and perhaps still is, in the process of continuing evolution. The old law of master and servant, which held sway through the eighteenth century and to some extent beyond, viewed the relationship as primarily one of status rather than of contract. While agreement gave rise to the relationship and might establish certain of its terms, it was "custom and public policy, not the will of the parties, [which] defined the implicit framework of mutual rights and obligations." (Selznick, Law, Society and Industrial Justice (1969) p. 123.)
The essence of the relationship as so defined drew its contours from the model of the householdin which, typically, the servant worked, the master had general authority to discipline the servant, and it was the servant's duty to obey. (Id., at pp. 124-125.) At the same time, the master had certain responsibilities for the servant's general welfare. (Id., at p. 128.) The relationship was thus in a sense paternalistic. And it was not terminable at will; rather, there existed a presumption (in the absence of contrary agreement) that employment was for a period of one year. (Id., at p. 125.)
With the industrial revolution in the nineteenth century the law of master and servant underwent a gradual remodeling, primarily at the hands of the judiciary. Primary emphasis came to be placed, through contract doctrine, upon the freedom of the parties to define their own relationship. "The emphasis shifted from obligation to freedom of choice." (Id., at p. 131.) The terms of the contract were to be sought in voluntary agreement, express or implied, the employee being presumed to have assented to the rules and working conditions established by the employer. (Ibid.)
In light of the generally superior bargaining power of the employer, "the employment contract became [by the end of the nineteenth century] a very special sort of contractin large part a device for guaranteeing to management unilateral power to make rules and exercise discretion." (Ibid.) And management's unilateral power extended, generally, to the term of the relationship as well. The new emphasis brought with it a gradual weakening of the traditional presumption that a general hiring (i.e., one without a specific term) was for a year, and its replacement by the converse presumption that "a general or indefinite hiring is prima facie a hiring at will." (Wood, A Treatise on the Law of Master and Servant (1877) § 134, fn. 49.)3 In California, this presumption is reflected in Labor Code section 2922, which provides: "An employment, having no specified term, may be terminated at the will of either party on notice to the other. Employment for a specified term means an employment for a period greater than one month."
The recognized inequality in bargaining power between employer and individual employee undergirded the rise of the labor unions and the institutionalization of collective bargaining.4 And through collective bargaining, unions have placed limitations on the employer's unilateral right of termination. Under most union contracts, employees can only be dismissed for "just cause," and disputes over what constitutes cause for dismissal are *1019 typically decided by arbitrators chosen by the parties.5 Collective bargaining agreements, however, cover only a small fraction of the nation's work force,6 and employees who either do not or (as in the case of managerial employees such as Mr. Pugh) cannot form unions7 are left without that protection.
In recent years, there have been established by statute a variety of limitations upon the employer's power of dismissal. Employers are precluded, for example, from terminating employees for a variety of reasons, including union membership or activities, race, sex, age or political affiliation.8 Legislatures in this country have so far refrained, however, from adopting statutes, such as those which exist in most other industrialized countries,9 which would provide more generalized protection to employees against unjust dismissal. And while public employees may enjoy job security through civil service rules10 and due process,11 the legal principles which give rise to these protections are not directly applicable to employees in private industry.12" (Footnotes omitted).
Thus, under the traditional rule, an employer could discharge a long-term employee for no cause, bad cause, or any cause whatsoever, without regard to his years of satisfactory performance, or the substantial opportunities he may have foregone to remain in the employer's service. As a result thereof the employee without recourse often suffered the cost and inconvenience of searching for a new job (if available), moving expenses and the costs of relocating a family, and emotional distress from embarrassment and loss of status. Until recently the "at will" doctrine was considered so well established that courts applied the rule without inquiring into its logic.
Both legislatures and courts have limited the "employment at will" doctrine in recent years to protect participants in union activity[2], workmen's compensation claimants[3], employees serving on jury duty[4], veterans[5], debtors[6], and informants[7], and prohibit employment practices that discriminate because of race, color, religion, sex, national origin[8], or age[9].
Factors which courts have considered in finding rights to job security include special or separate consideration given by the employee for the position, the common law of the job, and the longevity of the employee in the job. In the first instance courts have looked at benefits to the employer, such as surrender of tort claims[10], contributions to the business such as bringing in a special account[11], and the extent of job training. The separate consideration necessary to sustain a permanent employment contract may also have arisen from special reliance by the employee or a demonstration that the employee forfeited something other than services in order to procure the jobe.g.the *1020 sale of a business where the offer of employment constituted an inducement for the change of status[12], relinquishing a good job or turning down another favorable opportunity in return for a promise of job stability[13], uprooting his or her family and moving long distances to accept a job[14], or hard-sell recruiting efforts[15]. Note, Implied Contract Rights to Job Security, 26 Stan.L.Rev. 335 (1974).
In other cases courts have looked to the "common law of the job", or established policy of the firm, to determine the parties understanding as to the duration of a job. The firm's policy may be ascertained from handbooks[16], memorandum to employees[17], oral statements, or the job itself may imply a necessary and natural duration[18]. Furthermore, longevity of service may give rise to implied job security inasmuch as pension and health care plans are a form of deferred compensation and the unexpected severance of an elderly employee both leaves the worker in a precarious position and unjustly enriches the employer[19]. Similarly, inclusion in the employment contract of a covenant not to compete may support a claim that the employee would not be dismissed except for good cause. Implied Contract Rights to Job Security, supra.
The United States Supreme Court has recognized implied contractual rights to job security as a property right within the meaning of the 14th Amendment. In Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a faculty member who had taught in a state college system for 10 years was dismissed without hearing. Although the college did not have a tenure system, the school's faculty guide stated that a teacher's job was secure as long as the teacher's services were satisfactory and he or she was cooperative. At the expiration of Sindermann's 10th one year contract, the Board of Regents of Odessa Junior College voted not to offer him another contract, provided no official statement, no hearing and no appeal. A press release alleged that plaintiff's nonretention was due to insubordination that arose while he was serving as President of the Texas Junior College Teachers Association. The Supreme Court held that the denial of an opportunity to prove an implied contractual right to employment security violated plaintiff's due process rights. Said the Court:
[A]bsence of such an explicit contractual provision [tenure] may not always foreclose the possibility that a teacher has a "property" interest in re-employment. For example, the law of contracts in most, if not all, jurisdictions has long employed a process by which agreements, though not formalized in writing, may be "implied."109
Another approach applied by courts to deter unjust dismissals is the implied contractual duty to perform in good faith. In Fortune v. National Cash Register Co., 373 Mass. 96,364 N.E.2d 1251 (1977), the Massachusetts Supreme Judicial Court held that implicit in the plaintiff's employment contract was a covenant of good faith which limited the employer's power to discharge. Accord: Pugh v. Seas Candies, supra. This court has heretofore recognized, in other contexts, that a contract terminable at will is nevertheless subject to limitation on the exercise of that will, to wit: that such termination not be arbitrary and capricious. *1021 Gautreau v. Southern Farm Casualty Insurance Co., 410 So.2d 815 (La.App. 3rd Cir. 1982) writ granted, La., 414 So.2d 392. In Monge v. Beebe Rubber Co., 114 N.H. 130, 316 A.2d 549 (1974), the New Hampshire Supreme Court imposed a good faith limitation on employer discharge on the grounds that an absolute right to discharge endangered the important public policy of improving labor relations in the state.
Related hereto is: Summers, Individual Protection Against Unjust Dismissal: Time For A Statute, 62 Va.L.Rev. 481 (1976); Peck, Unjust Discharges from Employment: A Necessary Change in the Law, 40 Ohio St.L.J. 1 (1979); Employment at Will and the Law of Contracts, 23 Buffalo L.Rev. 211 (1973); The Employee's Emerging Right to Sue for Arbitrary or Unfair Discharge, 6 Emp.Rel.L.J. 422 (1980); Kelsay v. Motorola, Inc.: Tort Action for Retaliatory Discharge upon Filing Workmen's Compensation Claim, 12 John Marshall J.Prac. & Proc. 659 (1979); Protecting the Private Sector At Will Employee Who "Blows the Whistle": A Cause of Action Based Upon Determinants of Public Policy, 1977 Wisc.L.Rev. 777; Feinman, The Development of the Employment at Will Rule, 20 Am.J.Legal Hist. 118 (1976); Non-Statutory Cause of Action for an Employer's Termination of an "At Will" Employment Relationship: A Possible Solution to the Economic Imbalance in the Employer-Employee Relationship, 24 N.Y.L.Sch.L.Rev. 743 (1979); and last but not least, Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith, 93 Harv.L.Rev. 1816 (1980).
Louisiana protection from unjust discharge has as its origin La.Civ.Code Art. 2749 which provides:
Art. 2749. Liability for dismissal of laborer without cause
Art. 2749. If, without any serious ground of complaint, a man should send away a laborer whose services he has hired for a certain time, before that time has expired, he shall be bound to pay to such laborer the whole of the salaries which he would have been entitled to receive, had the full term of his services arrived.
However, the article's humane purpose of preventing abusive discharge has at times been thwarted by a narrow, limited construction of the term "hired for a certain time". Under jurisprudence of years past, permanent employment was often equated with employment at will. Thus, an injured worker who asserted his right to workmen's compensation and was discharged often found himself without recourse. In response to this abusive practice of employers, the Louisiana legislature in 1980, with the aid of organized labor, drafted a statute to protect injured workers who seek to avail themselves of our workmen's compensation laws. The enacted statute reads as follows:

SUBPART E. UNLAWFUL DISCRIMINATION PROHIBITED [NEW]
§ 1361. Unlawful discrimination prohibited
A. No person, firm or corporation shall refuse to employ any applicant for employment because of such applicant having asserted a claim for workmen's compensation benefits under the provisions of this Chapter or under the law of any state or of the United States. Nothing in this Section shall require a person to employ an applicant who does not meet the qualifications of the position sought.
B. No person shall discharge an employee from employment because of said employee having asserted a claim for benefits under the provisions of this Chapter or under the law of any state or of the United States. Nothing in this Chapter shall prohibit an employer from1 discharging an employee who because of injury can no longer perform the duties of his employment.
C. Any person who has been denied employment or discharged from employment in violation of the provisions of this Section shall be entitled to recover from the employer or prospective employer who has violated the provisions of this Section a civil penalty which shall be the equivalent of the amount the employee *1022 would have earned but for the discrimination based upon the starting salary of the position sought or the earnings of the employee at the time of the discharge, as the case may be, but not more than one year's earnings, together with a reasonable attorney's fee.
Added by Acts 1980, No. 704, § 1.
1 Changed from "form" to "from" on authority of R.S. 24:253.
(emphasis ours)
Hence, under Louisiana law, an employer must show good cause for discharging an employee engaged for a fixed term. Lanier v. Alenco, 459 F.2d 689 (5th Cir.C.A. 1972); LSA-C.C. Art. 2749. Assertion of a claim for workmen's compensation benefits is not good cause for discharge. LSA-R.S. 23:1361.
With regard to appellant's contention that the trial judge erred in finding that plaintiff was discharged for having asserted a claim against his employer, we note the following reasons assigned by the trial judge in his reasons for judgment:
"The railroad's letter of May 1, 1981 specifically advised the plaintiff that he could not be permitted to work for the railroad again in any capacity due to his final settlement dated March 13, 1980. The reason plaintiff was discharged was because of his assertion of a claim against the railroad."
We cannot say the trial judge's finding on this factual matter is clearly wrong; indeed, it appears to be the only conclusion supportable by the evidence. The only contrary evidence concerning the reasons for plaintiff's discharge is the ipse dixit statement of Mr. Robert L. Cathers, claims agent for the railroad, that plaintiff did not possess the character that defendant desired in its employees. We agree with the trial judge that plaintiff was dismissed for having asserted a claim against his employer. Accordingly, we proceed to address the issue of whether R.S. 23:1361 can be applied under the circumstances presented.
Railway employees are covered by the Federal Employers' Liability Act, 45 U.S. C.A. § 51 et seq., which extends to employees any part of whose duties further or substantially affect interstate commerce. As noted by Professors Malone and Johnson: "The expansive definition of the interstate commerce requirement of the FELA and the relative ease with which the requirement of negligence may be established under it have combined to make it virtually certain that an injured railway employee would not even seek benefits under a state compensation act." Malone & Johnson, Workers Compensation § 413 (1980 ed.). The relative ease with which recovery may be had is evidenced in Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), rehearing denied 353 U.S. 943, 77 S.Ct. 808, 71 L.Ed.2d 764, wherein it was held that the test of a jury case is whether proofs justify with reason conclusion that employer negligence played any part, even the slightest, in producing injury, and it does not matter that, from the evidence, the injury was attributable to employee's contributory negligence, since the statute expressly imposes liability upon the employer to pay damages for injury due in whole or part to the employer's negligence. Thus, under the FELA the employer is stripped of his common law defenses and the injured worker's burden is eased. Inasmuch as the act is remedial in nature, it is afforded a liberal construction.
From the foregoing we discern that although entitled a liability act, the standard of proof required to sustain an action is such that the FELA is, at least in part, compensatory in nature. We find the FELA to be within the scope of laws designated in LSA-R.S. 23:1361.
Furthermore, we perceive no conflict between state and federal interests. The state interest expressed in R.S. 23:1361 remains the same whether plaintiff's claim be categorized as tort or workmen's compensationprotecting the assertion of legal right from retaliatory repercussion. On the other hand, no federal policy is interfered with by affording railroad employees the protection of R.S. 23:1361. Clearly, Louisiana is free to accord its workers greater protection from discrimination.
*1023 We find Andrews v. Louisville & Nashville Railroad Co., 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), relied upon by appellant, to be inapposite. Andrews held that where the only source of a railroad employee's right not to be discharged was a collective bargaining agreement between the railroad and union, the plaintiff-employee who had not pursued his administrative remedy under the Railway Labor Act could not bring an action against the railroad for wrongful discharge. The plaintiff herein asks for no relief under any collective agreement; rather, he seeks to invoke La.R.S. 23:1361. We have found no law evidencing an intention to render federal channels exclusive for retaliatory discharge claims.
The principal purpose of R.S. 23:1361 is remedial, rather than penal. Remedial and penal statutes are distinguishable in terms of the nature of the evil sought to be remedied by the legislation; it is penal if it undertakes to redress to the public and remedial if it undertakes to remedy a wrong to the individual. 3 Sutherland, Statutory Construction, § 60.03, at 33 (4th ed. Sands, 1974); State v. Boniface, 369 So.2d 115 (La.1979). R.S. 23:1361 was designed to protect individuals from discrimination by virtue of their assertion of legal right.
Inasmuch as R.S. 23:1361 is a remedial statute, it is to be liberally construed to suppress the evil and to advance the remedy. Starks v. Orleans Motors, Inc., 372 F.Supp. 928 (E.D.La.1974). What is a liberal construction is ordinarily one which makes the statutory rule or principle apply in more situations than would be the case under a strict construction. State v. Boniface, supra. In the present case the evil to be deterred is unjust dismissals. The employee must be able to exercise his right in an unfettered fashion without being subjected to reprisal. The remedy is intended to place the discriminated-against employee in the same position he would have been but for the employer's retaliatory conduct, thereby affording the worker an opportunity to organize his affairs and enter the work force anew. Extending the statute's remedy to workers discharged for asserting FELA claims is entirely consistent with liberal construction afforded remedial acts.
Next, appellant contends that R.S. 23:1361 entitled "Unlawful discrimination prohibited", is unconstitutional in that it violates Art. 3 Section 15(A) of the 1974 Louisiana Constitution which requires that "Every bill ... shall be confined to one object. Every bill shall contain a brief title indicative of the object." According to appellant, the body of the statute involved is broader than the title inasmuch as the title makes no reference to federal laws, therefore R.S. 23:1361 is invalid. However, it is only where the variance in the provisions of an act is palpable and totally irreconcilable with its title, or where both title and body express two distinct subjects, that the intention of the legislature will be held to be in conflict with the Constitution. Jefferson Parish v. Louisiana Dept. of Corrections, 259 La. 1063, 254 So.2d 582 (1971). The act at issue specifically prohibits discrimination against employees asserting a claim "under the provisions of this Chapter or under the law of any state or of the United States". The purpose of the constitutional provision that every statute have a title indicative of its object is not to require that the title of an act be an index of its contents, but only that the title in general direct attention to the purposes of the law. State v. Sliger, 261 La. 999, 261 So.2d 643 (1972). The title does not limit its application to claims for workmen's compensation benefits under state law; it does give fair notice as to its scope. We find R.S. 23:1361 constitutional.
Furthermore, the evidence indicates that plaintiff established a prima facie case under La.Civ.Code Art. 2749. The abovementioned letter received by plaintiff noted his seniority, requested his return to work and warned "If you have not marked upon in the allotted time, or given evidence as to why you cannot you will be considered without proper authority and in violation of proper instructions." Apparently, it was the understanding of the parties that the employment relationship would continue indefinitely *1024 pending the occurrence of some good and just cause for termination. Hence the term of employment was ascertainable. However, our resolution of plaintiff's R.S. 23:1361 claim renders it unnecessary for us to decide this issue.
For the reasons assigned, the judgment appealed is affirmed at appellant's cost.
AFFIRMED.
DOMENGEAUX, J., concurred in result only and assigned reasons.
DOMENGEAUX, Judge, concurring.
I concur in the result only. I agree that the circumstances of this case and the fact that plaintiff's claim was asserted and settled under the F.E.L.A. is such that his suit herein is lawfully asserted under the provisions of La.R.S. 23:1631.
I also agree that La.R.S. 23:1361 is not violative of Art. 3, Section 15(A) of the Louisiana Constitution of 1974.
NOTES
[1] Appellant does not rely on the release provisions wherein plaintiff agrees not to return to work for Missouri Pacific Railroad.
[2] National Labor Relations Act, 29 U.S.C. § 158(a).
[3] Frampton v. Central Indiana Gas Co., 260 Ind. 249, 297 N.E.2d 425 (1973).
[4] Ness v. Hocks, 272 Or. 210, 536 P.2d 512 (1975).
[5] Universal Military Training and Service Act, 50 U.S.C.App. § 459(b) (1968); Carter v. United States, 401 F.2d 1238 (D.C.Cir.1968).
[6] Consumer Credit Protection Act, 15 U.S.C. § 1674(a) (1970).
[7] Harless v. First National Bank in Fairmont, 246 S.E.2d 270 (W.Va.1978); cf: Tameny v. Atlantic Richfield Co., 27 Cal.3d 167, 164 Cal. Rptr. 839, 610 P.2d 1330 (1980) refusing to participate in an illegal price-fixing scheme; Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 427 A.2d 385 (1980); Petermann v. Teamster's Local 396, 174 Cal.App.2d 184, 344 P.2d 25 (1959) refusal to give perjured testimony.
[8] Title VII of the Civil Rights Act of 1964, § 701 et seq., 42 U.S.C. § 2000e et seq. For a recent case involving reverse discrimination discharge claims pursuant to the abovementioned act see Morgan v. O'Bryant, 671 F.2d 23 (1st Cir.1981).
[9] Age Discrimination in Employment Act, 29 U.S.C. § 623 (1970).
[10] Pierce v. Tennessee Coal Iron & R.R., 173 U.S. 1, 19 S.Ct. 335, 43 L.Ed. 591 (1905).
[11] Downes v. Poncet, 38 Misc. 799, 78 N.Y.S. 883 (N.Y. City Ct. 1902).
[12] Bondi v. Jewels by Edwar, Ltd., 267 Cal. App.2d 672, 73 Cal.Rptr. 494 (2d Dist.1964).
[13] Maloney v. E.I. DuPont de Nemours & Co., 352 F.2d 936 (D.C.Cir.1965), cert. denied 383 U.S. 948, 86 S.Ct. 1201, 16 L.Ed.2d 219 (1966).
[14] Ward v. Consolidated Foods Corp., 480 S.W.2d 483 (Tex.Civ.App.1972).
[15] Id.
[16] Greene v. Howard Univ., 412 F.2d 1128 (D.C.Cir.1969).
[17] Brawthen v. H & R Block, Inc., 28 Cal. App.3d 131, 104 Cal.Rptr. 486 (1st Dist.1972).
[18] Woods v. M.A. Shumard & Co., 114 La. 451, 38 So. 416 (1905); Sarusal v. Seung, 96 Wash. 295, 165 P. 116 (1917).
[19] Fulton v. Tennessee Walking Horse Breeders Assoc. of America, 63 Tenn.App. 569, 476 S.W.2d 644 (1971).