## ANDREWS v. LOUISVILLE & NASHVILLE RAILROAD CO. ET AL.

No. 71–300.  Argued March 22, 1972—Decided May 15, 1972

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 326. POWELL, J., took no part in the consideration or decision of the case.

*Andrew W. Estes* argued the cause for petitioner. With him on the brief was *James E. Slaton.*

*William H. Major* argued the cause for respondents. With him on the brief were *Lamar W. Sizemore* and *Robert G. Young.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner brought suit in the state trial court of Georgia seeking damages for alleged "wrongful discharge"

by the respondent.*    He alleged that prior to an auto accident in 1967, he had been an employee in good standing of the respondent, employed "under specified conditions and with a stipulated schedule of benefits." He alleged that following the accident, he had fully recovered and was physically able to resume his work for respondent, but that respondent had refused to allow him to return to work, and that respondent's actions amounted to a wrongful discharge.    He prayed for damages consisting of loss of past and future earnings and for attorneys' fees.    Respondent removed the case to the United States District Court and there moved to dismiss the complaint for failure to exhaust the remedies provided by the § 3 First (i) of the Railway Labor Act, 44 Stat. 579, as amended, 48 Stat. 1191, 45 U. S. C. § 153 First (i).    See also 1966 amendments to § 3 Second, 80 Stat. 208.    The District Court granted the motion, and the Court of Appeals for the Fifth Circuit affirmed.    We granted certiorari, 404 U. S. 955, and are once more confronted with the question of whether *Moore* v. *Illinois Central R. Co.,* 312 U. S. 630 (1941), should be overruled.

*Moore* held that a railroad employee who elected to treat his employer's breach of the employment contract as a discharge was not required to resort to the remedies afforded under the Railway Labor Act for adjustment and arbitration of grievances, but was free to commence in state court an action based on state law for breach of contract.    The result was supported by the Court's conclusion that the procedures for adjustment of "minor

---

*References throughout the opinion to respondent are to the Georgia Railroad Co., which consisted of properties leased by Louisville & Nashville Railroad Co. and Seaboard Coastline Railroad Co. The petitioner alleged in his complaint that the Georgia Railroad Co. had refused to allow him to return to work.

disputes" under the Railway Labor Act had been intended by Congress to be optional, not compulsory, and that therefore a State was free to accord an alternative remedy to a discharged railroad employee under its law of contracts. The basic holding of *Moore* was reaffirmed and its state law aspects amplified in *Transcontinental & Western Air, Inc.* v. *Koppal,* 345 U. S. 653 (1953). There it was held that if state law required the employee to exhaust administrative remedies provided for in his contract of employment before resorting to court, a federal diversity court should enforce that requirement.

Later cases from this Court have repudiated the reasoning advanced in support of the result reached in *Moore* v. *Illinois Central, supra.* Fifteen years ago, in *Brotherhood of Railroad Trainmen* v. *Chicago R. & I. R. Co.,* 353 U. S. 30, 39 (1957), this Court canvassed the relevant legislative history and said:

> "This record is convincing that there was general understanding between both the supporters and the opponents of the 1934 amendment that the provisions dealing with the Adjustment Board were to be considered as compulsory arbitration in this limited field."

When the issue was again before the Court in *Walker* v. *Southern R. Co.,* 385 U. S. 196 (1966), it was observed:

> "Provision for arbitration of a discharge grievance, a minor dispute, is not a matter of voluntary agreement under the Railway Labor Act; the Act compels the parties to arbitrate minor disputes before the National Railroad Adjustment Board established under the Act." 385 U. S., at 198.

Thus, the notion that the grievance and arbitration procedures provided for minor disputes in the Railway Labor Act are optional, to be availed of as the employee or the carrier chooses, was never good history and is no longer good law.

The related doctrine expressed in *Moore* and *Koppal,* that a railroad employee's action for breach of an employment contract is created and governed by state law, has been likewise undercut by later decisions. In *Machinists* v. *Central Airlines,* 372 U. S. 682 (1963), an agreement required under § 204 of the Railway Labor Act was said to be "like the Labor Management Relations Act § 301 contract . . . a federal contract and . . . therefore governed and enforceable by federal law, in the federal courts." 372 U. S., at 692. A similar result was reached under § 301 (a) of the Labor Management Relations Act in *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448 (1957).

In *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650 (1965), the Court deduced from the Labor Management Relations Act a preference for the settlement of disputes in accordance with contractually agreed-upon arbitration procedures. It accordingly held that before a state court action could be maintained for breach of such a contract, the employee must first *"attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress." 379 U. S., at 652. In *Maddox,* the Court not only refused to extend *Moore* to save state court actions for breach of contract under § 301 of the Labor Management Relations Act, but intimated that its rule might well not survive even in Railway Labor Act cases. Indeed, since the compulsory character of the administrative remedy provided by the Railway Labor Act for disputes such as that between petitioner and respondent stems not from any contractual undertaking between the parties but from the Act itself, the case for insisting on resort to those remedies is if anything stronger in cases arising under that Act than it is in cases arising under § 301 of the LMRA.

The fact that petitioner characterizes his claim as one for "wrongful discharge" does not save it from the Act's

mandatory provisions for the processing of grievances. Petitioner argues that his election to sever his connection with the employer and treat the latter's alleged breach of the employment contract as a "discharge" renders his claim sufficiently different from the normal disputes over the interpretation of a collective-bargaining agreement to warrant carving out an exception to the otherwise mandatory rule for the submission of disputes to the Board. But the very concept of "wrongful discharge" implies some sort of statutory or contractual standard that modifies the traditional common-law rule that a contract of employment is terminable by either party at will. Here it is conceded by all that the only source of petitioner's right not to be discharged, and therefore to treat an alleged discharge as a "wrongful" one that entitles him to damages, is the collective-bargaining agreement between the employer and the union. Respondent in this case vigorously disputes any intent on its part to discharge petitioner, and the pleadings indicate that the disagreement turns on the extent of respondent's obligation to restore petitioner to his regular duties following injury in an automobile accident. The existence and extent of such an obligation in a case such as this will depend on the interpretation of the collective-bargaining agreement. Thus petitioner's claim, and respondent's disallowance of it, stem from differing interpretations of the collective-bargaining agreement. The fact that petitioner intends to hereafter seek employment elsewhere does not make his present claim against his employer any the less a dispute as to the interpretation of a collective-bargaining agreement. His claim is therefore subject to the Act's requirement that it be submitted to the Board for adjustment.

The constitutional issue discussed in the dissent was not set forth as a "question presented for review" in the

petition for certiorari, and therefore our Rule 23 (1)(c) precludes our consideration of it. "We do not reach for constitutional questions not raised by the parties." *Mazer* v. *Stein*, 347 U. S. 201, 206 n. 5 (1954).

The term "exhaustion of administrative remedies" in its broader sense may be an entirely appropriate description of the obligation of both the employee and carrier under the Railway Labor Act to resort to dispute settlement procedures provided by that Act. It is clear, however, that in at least some situations the Act makes the federal administrative remedy exclusive, rather than merely requiring exhaustion of remedies in one forum before resorting to another. A party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding. *Union Pacific R. Co.* v. *Price*, 360 U. S. 601 (1959). He is limited to the judicial review of the Board's proceedings that the Act itself provides. *Gunther* v. *San Diego & A. E. R. Co.*, 382 U. S. 257 (1965). In such a case the proceedings afforded by 45 U. S. C. § 153 First (i), will be the only remedy available to the aggrieved party.

In *Walker* v. *Southern R. Co.*, 385 U. S. 196 (1966), the Court noted that there had been complaints not only about the long delay in processing of grievances on the part of the Adjustment Boards, but also about the fact that a more extensive right of judicial review of Board action was accorded to carriers than to employees. The Court noted that Congress, by Public Law 89–456, 80 Stat. 208, effective June 20, 1966, had legislated to correct these difficulties, but observed that the employee in *Walker* had not had the benefit of these new procedures. It therefore declined, "in his case," 385 U. S., at 199, to overrule *Moore*. Petitioner Andrews, however, would in the prosecution of his claim before the Adjustment Board have the benefit of these

improved procedures. We now hold that he must avail himself of them, and in so doing we necessarily overrule *Moore* v. *Illinois Central R. Co., supra.*

*Affirmed.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

I

If this employee wanted reinstatement and back pay, there would be merit in remitting him to the remedies under the Railway Labor Act. But he does not want that relief. Rather, he desires to quit the railroad, to have no further jobs with it, and to be compensated in dollars for his wrongful discharge.

The cases on which the Court relies to overrule *Moore* v. *Illinois Central R. Co.,* 312 U. S. 630, are quite different. *Brotherhood of Railroad Trainmen* v. *Chicago R. & I. R. Co.,* 353 U. S. 30, involved claims of existing employees, not for damages for wrongful discharge, but for "additional compensation" and for "reinstatement," and involved a "minor" dispute, that is, a controversy "over the meaning of an existing collective bargaining agreement." *Id.,* at 32–33. *Machinists* v. *Central Airlines,* 372 U. S. 682, also involved reinstatement "without loss of seniority and with back pay." *Id.,* at 683. In *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650, the aggrieved employee wanted "severance pay" allegedly owed under the collective-bargaining agreement. *Id.,* at 650–651. In *Walker* v. *Southern R. Co.,* 385 U. S. 196, the dispute basically involved an issue of seniority, though the opinion does not disclose it.[1]

---

[1] The opinion of the Court of Appeals in the *Walker* case makes clear that the seniority dispute was based on the collective agreement. 354 F. 2d 950.

The complaint in this case alleges that following an automobile accident, in which the petitioner-employee was involved, the company refused to allow him to go to work on the ground he had not recovered sufficiently to perform his former duties. No issue involving the collective-bargaining agreement was tendered. Petitioner—rightly or wrongly—claimed this was a discharge and that under Georgia law, governing the place where he worked, he had been deprived of wages from the time he recovered from the accident, and that he was deprived "of the expectancy of future earnings . . . until the date of his scheduled retirement."

In other words, he asks for no relief under the collective agreement, he does not ask for reinstatement or severance pay, he does not ask for continued employment. He is finished with this railroad, and turns to other activities; he seeks no readmission to the collective group that works for the railroad. He leaves it completely and seeks damages for having been forced out.[2]

---

[2] The Georgia law of "wrongful discharge" seems to amount to a set of common-law axioms of construction to fill in the ambiguities in employment contracts and employment relationships. If there is a contract, however, which expressly addresses the issue, the contract, and not the construction axioms, controls. For example, unless a contract provides otherwise, disobedience is a ground for discharge, *Georgia Coast & Piedmont R. Co.* v. *McFarland,* 132 Ga. 639, 64 S. E. 897, as is disrespectful language, *Wade* v. *Hefner,* 16 Ga. App. 106, 84 S. E. 598. If the employment contract, whether oral or written, provides that the worker may be fired only if his performance is unsatisfactory, he may not be discharged only for economic necessity, *Lummus Cotton Gin Co.* v. *Baugh,* 29 Ga. App. 498, 116 S. E. 51, although "mitigating factors" may generally be a defense. *Walker* v. *Jenkins,* 32 Ga. App. 238, 123 S. E. 161.

But where the language of the agreement is clear, that language controls and not the rules of construction. Thus, if the parties provide that the employer may fire at will, no discharge can be wrongful. *Webb* v. *The Warren Co.,* 113 Ga. App. 850, 149 S. E. 2d 867.

The general presumption is that hiring is terminable at will,

To remit him to the National Railroad Adjustment Board is to remit him to an agency that has no power to act on this claim. We said as much in *Slocum* v. *Delaware, L. & W. R. Co.*, 339 U. S. 239. That case involved a grievance that "concerned interpretation of an existing bargaining agreement." *Id.*, at 242. We therefore held that the employee first had to exhaust his remedies before the Adjustment Board. We distinguished the case from *Moore* as follows:

"Our holding here is not inconsistent with our holding in *Moore* v. *Illinois Central R. Co.*, 312 U. S. 630. Moore was discharged by the railroad. He could have challenged the validity of his discharge before the Board, seeking reinstatement and back pay. Instead he chose to accept the railroad's action in discharging him as final, thereby ceasing to

---

unless some definite period of employment is provided or inferable from the relationship. Ga. Code Ann. §.66–101 (master and servant). The intent of the parties is the guide to determine if the courts may look to custom or the pay interval, if the contract is otherwise ambiguous. *Odom* v. *Bush*, 125 Ga. 184, 53 S. E. 1013. Thus, if the worker is paid monthly, he must be given 30 days' notice.

As to damages, once it is shown that the discharge was wrongful, the measure of damages is the difference between the rate of pay and what the dischargee might have been able to earn in other employment. Ga. Code Ann. § 4–216. The fact that the employer prevented the employee from performing the remainder of the service is not a bar to recovery on that portion of the term. *Irwin* v. *Young*, 91 Ga. App. 773, 87 S. E. 2d 322.

For Andrews to recover on a damages theory, it appears that it would be necessary for him to show first that he was not dischargeable at will. We do not know from the pleadings what proof Andrews will tender. So far as we can now tell the collective agreement is not in issue. His complaint does not state the source of the employer's duty; and respondents allege that the collective agreement creates no such duty. As to damages it is also impossible to say that any terms of the collective agreement will be relevant to this dispute.

be an employee, and brought suit claiming damages for breach of contract. As we there held, the Railway Labor Act does not bar courts from adjudicating such cases. *A common-law or statutory action for wrongful discharge differs from any remedy which the Board has power to provide,* and does not involve questions of future relations between the railroad and its other employees. If a court in handling such a case must consider some provision of a collective-bargaining agreement, its interpretation would of course have no binding effect on future interpretations by the Board." 339 U. S., at 244. (Emphasis added.)

The Adjustment Board has considerable expertise in construing and applying collective-bargaining agreements, as respects severance pay, seniority, disciplinary actions by management, and the various aspects of reinstatement. But the body of law governing the discharge of employees who do not want or seek reinstatement is not found in customs of the shop or in the collective agreement but in the law of the place where the employee works. The Adjustment Board is not competent to apply that law. In the first place the members of the four divisions of the Adjustment Board authorized by 45 U. S. C. § 153 First (b) presumably do not know the local law governing the employee-employer relationships in all of the States where railroads run. In the second place, the personnel of these divisions of the Adjustment Board may occasionally have lawyers on them but law-trained members are the exception, not the rule. In the third place, an employee seeking damages for reinstatement is normally entitled to a jury trial; and no division of the Adjustment Board ever pretends to serve in that role.

The Board, we now know, is made up of laymen; those laymen have no insight into the nuances of Georgia

law on the question of damages, and they obviously cannot even purport to give the remedy in damages which a "court suit" entails.

The regime of mediation and arbitration under collective-bargaining agreements, such as the one we upheld in *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, and those we have cited under the Railway Labor Act, are important in stabilizing relations between unions and employers. See *U. S. Bulk Carriers* v. *Arguelles,* 400 U. S. 351, 355–356. But where the collective-bargaining agreement is not directly involved, and certainly where the individual employee, who tenders his grievance, wants to quit the railroad scene and go elsewhere and sever his communal relation with union and railroad, the case falls out of the ambit of authority given to the mediation or arbitration agencies.

The courthouse is the forum for that litigant and I would never close its door to him, unless the mandate of Congress were clear. Even then I do not see how the Seventh Amendment could be circumvented: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

Though the case is in the federal courts, this employee sues to enforce a common-law right recognized by the State of Georgia. The only place he can get a trial by jury is in a court. If he sues under a collective-bargaining agreement, he does not sue at common law but under a statutory federal regime. Yet that is not this case.

Everyone who joins a union does not give up his civil rights. If he wants to leave the commune and assert his common-law rights, I had supposed that no one could stop him. I think it important under our constitutional regime to leave as much initiative as possible to the individual. What the Court does today is ruthlessly

to regiment a worker and force him to sacrifice his constitutional rights in favor of a union. I would give him a choice to pursue such rights as he has under the collective agreement and stay with the union,[3] or to quit it and the railroad and free himself from a regime which he finds oppressive. I would construe the federal law as giving the employee that choice. The choice imposed by the Court today raises serious constitutional questions[4] on which we have not had the benefit of any argument.

This is a plain, ordinary, common-law suit not dependent on any term or provision of a collective-bargaining agreement. I cannot, therefore, join those who would close the courthouse door to him. Under the First Amendment, as applied to the States by the Fourteenth, he is petitioning the Government "for a redress of grievances" in the traditional manner of suitors at common law; and by the Seventh Amendment is entitled to a jury trial.

## II

As noted, my basic disagreements with the majority concern the validity of the two assumptions implicit in its holding: (a) that the collective agreement will be sufficiently implicated in this dispute to warrant the application of federal substantive law, and (b) that Congress has vested the Board with jurisdiction to enter-

---

[3] The Board is currently disposing of petitions at the rate of about 1,500 annually. At that rate the Board will eliminate its present backlog of slightly more than 3,000 cases in two years. Thirty-Seventh Annual Report of the National Mediation Board 95 (Table 9) (1971).

[4] Constitutional issues not raised by the parties are at times passed upon by the Court. For a notorious example, see *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, and Butler, J.'s comments, *id.,* at 88–89. See also *Mapp* v. *Ohio,* 367 U. S. 643, 673–677 (Harlan, J., dissenting); *Redrup* v. *New York,* 386 U. S. 767, 771–772 (Harlan, J., dissenting).

tain nonreinstatement grievances such as Andrews' complaint. But, even taking these assumptions as correct for purposes of argument, I believe the Court has erred.

The majority does not hold that Congress has mandated that the statutory procedure be the exclusive route for adjusting Andrews' grievance. Indeed, that path was foreclosed by our decision in *Walker* v. *Southern R. Co.*, 385 U. S. 196, holding that prior to the 1966 amendments Congress had evinced no such purpose, and by the fact that nothing in the 1966 amendments themselves evidences an intention to render the statutory channel exclusive for nonreinstatement claims.[5] Rather, today's result is grounded in the authority of the federal courts to fashion the substantive law to be applied to collective agreements. *Machinists* v. *Central Airlines*, 372 U. S. 682, 695; see also *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448. Even under that assumption, I would not impose the exhaustion requirement upon this narrow and readily identifiable group of dischargees.

There is no equation of the substantive law to govern agreements under § 301 of the Labor Management Relations Act, into which exclusive arbitration clauses may voluntarily be inserted by the parties and the substantive law to govern railroad contracts, onto which the statutory grievance procedure is superimposed by law. One would not suppose that every doctrine developed under the Labor Management Relations Act, 61 Stat. 136, should be carried over into the apparatus created by the Railway Labor Act. A salutary doctrine under one measure may serve no worthwhile purpose under the other. Yet today the majority transplants

---

[5] Nothing in the 1966 amendments nor their related legislative history even suggests or hints at a design to overrule *Moore* v. *Illinois Central R. Co.*, 312 U. S. 630. See H. R. Rep. No. 1114, 89th Cong., 1st Sess. (1965); S. Rep. No. 1201, 89th Cong., 2d Sess. (1966).

the *Maddox* rule in the foreign soil of the railroad world without any discussion of the ends to be served. Even *Maddox* cautioned against that result, stating that any overruling of *Moore* should come only after "the various distinctive features of the administrative remedies provided by [the Railway Labor] Act can be appraised in context, *e. g.,* the make-up of the Adjustment Board, the scope of review from monetary awards, and the ability of the Board to give the same remedies as could be obtained by court suit." 379 U. S., at 657 n. 14.

It is said that the fact that Congress (rather than private parties as in *Maddox*) fashioned the instant adjustment procedure somehow reinforces a presumption of exclusivity. Yet it is difficult to perceive how that can be when it is also conceded, as mentioned earlier, that Congress itself has never designed its prescription to be the sole avenue of redress for this limited class of claimants. Rather, the significance of the statutory source of this procedure lies in its inflexibility and immunity from modification through collective bargaining. Unlike the *Maddox* rule, what is done today cannot be undone tomorrow through contract negotiation.[6] That difference would seem to warrant caution to ensure that more is to be gained than lost by closing the courthouse door.

One clear disadvantage counsels against today's holding. Given the nature of permanent dischargees' weak positions *vis-à-vis* their former unions, the personnel manning the adjustment mechanism, its haphazard decisional process, and the absence of judicial review of Board decisions, the risk is substantial that valid com-

---

[6] It was expressly observed by the majority in *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650, 657–658, that bargaining parties could avoid the force of that opinion simply by agreeing that arbitration was not the exclusive remedy.

plaints of permanent dischargees such as Andrews will be unfairly treated.

The machinery erected by the Railway Labor Act was not meant to be judicial in nature. Rather, it was designed as an arbitration process in which the union and the carrier occupy opposite sides of a bargaining table. As a substitute for the economic battleground, the process envisions decisionmaking on the basis of strength and accountability to the interests represented. Unions will often press one grievance at the expense of another. If Andrews were a continuing union member perhaps he would receive equal representation. But because the union will not have to answer to him if his claim is lost the union may yield its merit in the logrolling process carried on with management. I now have doubt that the reasoning of *Maddox* was sound insofar as we opined that a union agent will have sufficient interest in faithfully prosecuting the complaint of a former member who "has lost his job and is most likely outside the union door looking in instead of on hand to push for his claim." 379 U. S., at 653 (majority opinion), and 668 (Black, J., dissenting). Indeed, only this Term in *Chemical Workers* v. *Pittsburgh Glass,* 404 U. S. 157, we refused to permit a union to represent nonvoting pensioners, holding that under the National Labor Relations Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.,* the company was not required to bargain with respect to pension plans affecting inactive retirees. We reasoned that "the risk cannot be overlooked that union representatives on occasion might see fit to bargain for improved wages or other conditions favoring active employees at the expense of retirees' benefits." [7] *Id.,* at 173.

---

[7] One commentator on the Act has warned that representation by a union may be a critical factor in obtaining a favorable award: "[A]n individual's efforts will presumably be less effective than that

Beyond the inherent risk of compromise of a dischargee's claim there lie still further obstacles to fair treatment. First, the internal procedures used by the Board are far afield from those normally associated with impartial adjudication. The Board is exempt from the Administrative Procedure Act, § 2 (a)(1), 5 U. S. C. § 551 (1). One account of its *ad hoc* procedures leaves little doubt that before that forum Andrews will have no means of proving his allegations:

> "As the Board has operated in practice, the procedures followed in holding hearings have been quite informal and have differed from the trial-type hearings conducted by other agencies established and maintained by the Federal Government. Disputes are referred to the Adjustment Board by the filing of written submissions. Each submission contains a statement of claim, accompanied by a statement of facts. If the parties can agree, a joint statement of facts is filed; if they cannot agree, separate submissions are filed, stating the facts separately. All submissions are in writing. Parties may be heard in person, by counsel, or by other representatives as they elect. . . . It would be most extraordinary for live testimony to be given by witnesses. There is no requirement that a factual submission or other

of a union, particularly since the grievance will ultimately be resolved by a board composed in part of representatives of affected unions." Risher, The Railway Labor Act, 12 B. C. Ind. & Com. L. Rev. 51, 72 (1970). The plight of the unionless grievant is more alarming when viewed in light of the unsatisfactory record under the Act: *"The Railway Labor Act is special privilege legislation,* the product of the once great political power of the railroad unions. It has been administered as such. This accounts for the dismal administrative records of the National Mediation Board and the National Railroad Adjustment Board in . . . protection of individual rights, and grievance adjustments." Northrup, Foreword to Risher, The Railway Labor Act, *supra,* at 52.

written statement be sworn. There is no cross-examination of witnesses and no record or transcript of the proceedings. There is no provision for issuance of subpenas or compulsory attendance of witnesses." Hearing on H. R. 706 [1966 Railway Labor Act amendments] before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 89th Cong., 2d Sess., 49 (1966).

All of this might be made tolerable if at some point in his journey Andrews could look forward to a judge's inquiry into the affair. But the fact is that whatever order by whatever process the Board may enter will be virtually immune from any judicial review because an award, either of the Adjustment Board or of a special board, is reviewable only for fraud or for lack of jurisdiction. 45 U. S. C. § 153 (p) (proviso).

On the other side of the balance, it could not be claimed that permitting a judicial remedy (in addition to an administrative one) would risk economic warfare, especially in light of the estranged relationship of permanent dischargees to their former unions. Nor could it be claimed that a judicial remedy would risk nonuniformity in interpretation of collective agreements inasmuch as courts as well as the Board would be obliged to apply a single body of federal common law. See *Maddox, supra,* at 658 n. 15.

In summary, the danger of unfair treatment of the clearly identifiable class of dischargees represented by Andrews is so great, without any compensating advantages, that I would not confine these claimants to the administrative remedy.