CONSOLIDATED RAIL CORPORATION

v.

AMERICAN TRAIN DISPATCHERS
ASSOCIATION, Appellant.

No. 82–1722.

United States Court of Appeals,
Third Circuit.

Argued June 9, 1983.

Decided Sept. 2, 1983.

Hermon M. Wells (argued), Consolidated Rail Corp., Philadelphia, Pa., for appellee.

Edward J. Hickey, Jr., Thomas A. Woodley (argued), Mulholland & Hickey, Washington, D.C., for appellant.

Before SEITZ, Chief Judge, SLOVITER, Circuit Judge and SAROKIN, District Judge.*

## OPINION OF THE COURT

SEITZ, Chief Judge.

The American Train Dispatchers Association (ATDA) appeals from an order of the district court vacating two awards of the National Railroad Adjustment Board, Third Division (NRAB), for want of jurisdiction in the Board, and enforcing a third award in which the NRAB found that it lacked subject matter jurisdiction over the claim. This court has jurisdiction to review the district court's order under 28 U.S.C. § 1291.

I

Faced with the possible cessation of freight railroad operations in the Northeast and Midwest following the bankruptcies of the Penn Central and six other railroads, Congress enacted the Regional Rail Reorganization Act of 1973 (RRRA), Pub.L. 93–236, 45 U.S.C. §§ 701 *et seq.* The RRRA reorganized the bankrupt carriers as the Consolidated Rail Corporation (Conrail) in

---

\* The Honorable H. Lee Sarokin, United States District Judge for the District of New Jersey, sitting by designation.

order to ensure that freight service would continue to these key industrial regions. Title V of the RRRA, entitled "Employee Protection," defined Conrail's rights and obligations vis-a-vis the employees of the bankrupt carriers it had absorbed.

Pending the negotiation of new labor agreements with each of the many unions representing Conrail employees, section 504 of the RRRA provided that with a few exceptions the existing labor agreements would remain in force. 45 U.S.C. § 774. One such agreement was that signed in 1960 between the former Pennsylvania Railroad, now part of Conrail, and the ATDA. Section 3–G–1 of this agreement provided as follows with respect to Conrail's power to transfer employees:

> When seniority or dispatching districts or parts thereof are merged or separated, not less than thirty (30) days' advance notice thereof will be given, in writing, by the Manager of Labor Relations to the General Chairman, and the manner in which the seniority of Train Dispatchers affected is to be exercised shall be adjusted by agreement, in writing, between the General Chairman and the Manager of Labor Relations.

The RRRA also gave Conrail certain powers to enable it to make the most efficient use of its employees. Section 503 of the RRRA gave Conrail "the right to assign, allocate, reassign, reallocate and consolidate work formerly performed on the rail property acquired pursuant to the provisions of this Act. . . ." 45 U.S.C. § 773. There is thus a potential conflict between section 503 of the RRRA and section 3–G–1 of the labor agreement because the statute does not require that Conrail give notice of pending transfers or agree in writing as to how the seniority of affected employees will be adjusted. Finally, section 507 of the RRRA provides that disputes concerning the "interpretation, application or enforcement" of title V, including section 503, may be submitted to binding arbitration. 45 U.S.C. § 777. Pursuant to this section, Conrail, the ATDA, and nine other labor unions in 1978 established Special Adjustment Board 880 (Special Board 880), its jurisdiction limited to title V disputes. The agreement establishing Special Board 880 was separate from the labor agreements between Conrail and the unions. In May of 1979 the agreement was re-executed, this time including as parties Amtrak and five additional unions. Neither version of the agreement provided a time limit on the Board's existence or a procedure whereby one or more parties could terminate the Board. The agreement does state that a party who has submitted a grievance to Special Board 880 may withdraw it at any time prior to the commencement of a hearing, and afterwards with the consent of the other party.

In October of 1976 Conrail notified the ATDA that it would shortly abolish three dispatching positions in Altoona, Pennsylvania, and transfer the work elsewhere, and that this action was being taken pursuant to section 503 of the RRRA. App. at 48. This was followed up by further letters and meetings in November and December, and the actual abolition and transfer of the positions took place on January 21 and 24, 1977. On January 24, the ATDA objected to Conrail's action on the ground that it violated section 3–G–1 of the labor agreement. Specifically, the union charged Conrail with not giving notice of the proposed changes and not agreeing in writing as to how the seniority of the transferred employees would be affected.

After exhausting the grievance procedures specified in regulation 7 of the labor agreement without resolving the disputes, the ATDA submitted claims on behalf of the three affected dispatchers to the NRAB, Third Division, pursuant to regulation 7 of the labor agreement and section 3, First of the Railway Labor Act (RLA), 45 U.S.C. § 153, First. Conrail responded before the NRAB that these were not disputes involving the labor agreement but were title V disputes, were covered by the arbitration provisions in section 507 of the RRRA, and should have been heard by Special Board 880 rather than by the NRAB. In all three cases the carrier and labor members

of the NRAB became deadlocked, and two of the cases were referred to one referee and the third to another. In the two cases heard by referee Magnan the NRAB decided that it had jurisdiction and that Conrail had violated section 3–G–1 of the labor agreement. In the third case, the NRAB held that the claim was primarily a title V claim and that jurisdiction lay with Special Board 880 rather than the NRAB.

Both parties appealed to the district court, the ATDA seeking to enforce the first two awards and to vacate the third, and Conrail seeking to vacate the first two and enforce the third. Each party moved for summary judgment. The district court granted Conrail's motion, holding that the agreement between Conrail and the ATDA establishing Special Board 880 gave that board exclusive jurisdiction over title V claims. This appeal followed.

The ATDA presents two arguments to support its contention that the district court erred in holding that the NRAB lacked jurisdiction to hear the three claims. The union first argues that the three disputes should be characterized as involving section 3–G–1 of the labor agreement rather than title V of the RRRA, and thus could be referred only to the NRAB. Second, the ATDA argues that even if these were title V disputes, the NRAB nonetheless had jurisdiction to hear them and the district court erred in holding that the agreement establishing Special Board 880 gave that Board exclusive jurisdiction over title V disputes.

## II

■ The first issue is whether to characterize the three disputes as primarily involving title V of RRRA or the labor agreement. These disputes obviously involve both title V and section 3–G–1 of the labor agreement. The characterization of the claims as primarily involving title V or the labor agreement implies nothing as to the merits, but is important in determining which board has jurisdiction to hear them. Since Special Board 880 can hear only title V cases, if the three claims involved here are characterized as primarily involving the

labor agreement there is no doubt that they should have been referred to the NRAB. Only if these are title V claims need we reach the issue of which board had jurisdiction.

In characterizing these claims we must take note of Congress' intent in passing the RRRA and establishing Conrail. This court has already stated that in creating Conrail "Congress primarily determined to provide a stable framework for labor-management relations" pending the negotiation of new labor agreements, rather than expecting that Conrail would continue the labor practices of the bankrupt carriers. *Matter of Central Railway Co. of N.J.*, 579 F.2d 804, 815 (3d Cir.1978). Section 504 of the RRRA provided that some preconveyance labor agreements would not be honored by Conrail. 45 U.S.C. § 774(a). The Act also provided that Conrail would honor other existing labor agreements on an interim basis only, pending negotiation of new agreements. 45 U.S.C. § 774(a), (d).

The legislative history also contains several references to Congress' intent that Conrail have some flexibility in labor matters. The RRRA gave Conrail "certain rights to assure better utilization of railroad employees," and sought to provide "much greater labor flexibility on the part of the management of the new corporation [Conrail]" than had been available to the bankrupt carriers. S.Rep. No. 601, 93d Cong., 1st Sess. (1973), *reprinted in* [1973] U.S.Code Cong. & Ad.News 3242, 3243, 3254. Since Congress recognized that Conrail's exercise of this flexibility would necessarily displace a number of employees, the RRRA provided an elaborate scheme of benefits for employees adversely affected by Conrail's reorganization of the bankrupt carriers. *Id.* at 3243, 3254, 3258.

We read Congress' express intent that Conrail be given flexibility in labor utilization in order to help ensure its success, its grant of power to Conrail to make employee transfers under section 503 of the RRRA, its provision of a comprehensive package of benefits for employees adversely affected by these transfers, and the establishment of

special arbitration provisions for title V cases as demonstrating a pervasive regulatory scheme entitled to judicial deference, and best given this deference by characterizing these disputes as title V matters rather than as ones arising primarily from section 3–G–1 of the labor agreement which Conrail inherited. This characterization makes the disputes eligible to be heard by Special Board 880, as involving the interpretation or application of section 503 of title V.

■ The ATDA advances several arguments supporting its position that these disputes primarily involve the labor agreement rather than title V. The union first notes that, but for the existence of the labor agreement, there could be no grounds for the claims. Thus, it reasons, the disputes arise primarily out of the labor agreement. This argument does not aid our task of characterization because it is the mirror image of Conrail's contention that, but for the power granted it in section 503 of the RRRA, it could not have acted as it did. A but for test cannot resolve the characterization issue in either party's favor.

■ The union next argues that Conrail's invocation of section 503 as a defense to the collective bargaining claims cannot serve to characterize these as title V disputes, citing *Andrews v. Louisville & Nashville Railway Co.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). The first flaw in this argument is that it is by no means clear that title V was first invoked as a defense. Conrail contends that it notified the ATDA as early as October that it was phasing out the Altoona positions pursuant to section 503. App. at 48; Smyth affidavit, Appellee's brief at App. A. Thus Conrail's claim is not necessarily a post hoc attempt to justify a violation of the labor agreement. Second, *Andrews* sheds no helpful light on this issue, other than to point out that the character of a dispute is determined by that which gives rise to it. *Andrews* involved a railroad worker who sought to bypass compulsory arbitration and litigate his claim in federal court by asserting that the employer's actions amounted to a wrongful discharge rather than a violation of a labor agreement. The Court held that the discharge could only be "wrongful" if it violated some provision of the labor agreement, and thus it had to be arbitrated. *Andrews* is thus as consistent with the proposition that the ATDA cannot make this a labor agreement dispute simply by calling it one as it is with the proposition that Conrail's section 503 defense cannot automatically make these title V disputes.

We also note, as a matter of statutory construction, that the fact that section 503 may appear only as a defense cannot automatically prevent a dispute from being characterized as primarily involving title V, because a title V issue will rarely arise in any other way. Section 503 is, as we have noted, a specific grant of power to Conrail. Conrail would not normally invoke section 503 in any proceeding unless its actions pursuant to that statute were challenged. The result of adopting the ATDA's position would be that Conrail, if it wished to preserve the title V character of a dispute, would have to win a race to Special Board 880, presumably while the ATDA sought out the NRAB, and obtain a declaration that it acted rightly whenever it acts pursuant to section 503. We see no reason to adopt the ATDA's position and turn each employee transfer case into a race to the arbitrator, with the prize being a preferred characterization of the dispute. Such a result could only add to the backlog of railway labor matters waiting to be arbitrated and appealed to the federal courts.

■ Finally, the ATDA claims that the correct test for characterization is whether a claim is "arguably" based on interpretation of a labor agreement, citing *United Transportation Union v. Penn Central Transportation Co.*, 505 F.2d 542 (3d Cir. 1974) and *Hages v. Aliquippa & Southern Railway Co.*, 427 F.Supp. 889 (W.D.Pa.1977). The difficulty with this contention is that these cases refer only to whether a dispute arises out of a labor agreement at all, and do not address the situation where the dispute may arise out of an agreement or a statute. The disputes here are "arguably"

related both to title V and to the labor agreement. Nor do the cases arise in a context where one characterization is favored by a pronounced congressional policy, a policy which has influenced our decision to characterize these as title V disputes. The cases to which the ATDA calls our attention do not stand for the proposition that a claim "arguably" related to a labor agreement must always be primarily characterized as involving that agreement, even where there exists an equally plausible alternative characterization favored by its inclusion in a comprehensive regulatory scheme.

■ We conclude, then, that the district court correctly characterized these claims as title V disputes rather than as violations of the labor agreement. Having done so, we now turn to the question of which board is the proper forum for arbitration of these disputes, the NRAB or Special Board 880.

### III

■ The ATDA contends that, even if these are title V claims, there is concurrent jurisdiction between the NRAB and Special Board 880, so that the NRAB could have heard these claims and the district court need not have vacated the awards in the two cases where the NRAB asserted jurisdiction. Conrail counters that the language of section 507 of the RRRA confers exclusive jurisdiction on Special Board 880 because section 507 explicitly refers to arbitration by a board established by section 3, Second of the RLA (Special Board 880), as opposed to a board established by section 3, First (NRAB). In the alternative, Conrail argues that the legislative history shows Congress intended that any board established pursuant to section 3, Second of the RLA would take jurisdiction to the exclusion of the NRAB.

The district court rejected both of Conrail's arguments and held that the statutes gave the NRAB and Special Board 880 concurrent jurisdiction over title V matters, but that the agreement which established Special Board 880 gave it exclusive jurisdiction over all title V disputes. We agree with the district court's reading of the parties' agreement and affirm that part of its holding which found exclusive jurisdiction based on the terms of the agreement. We therefore need not reach the issue of whether the statutes expressly or impliedly confer exclusive jurisdiction on Special Board 880.[1]

The district court reached its holding by reading the jurisdiction provision in the agreement establishing Special Board 880 in light of the purposes clause set out at the beginning of the agreement. The purposes clause provides that:

> [I]t is the intention of the parties signatory hereto to maintain uniformity and consistency in connection with the arbitration procedures established pursuant to section 507 of the Regional Rail Reorganization Act of 1973.

This clause was not part of the original 1978 agreement which established Special Board 880, but was included in a 1979 modification of the agreement which added Amtrak as a covered employer. It appears from this 1979 agreement that the parties agreed that uniform procedures should be established for all title V arbitration involving any of the covered unions, including the ATDA, and either Amtrak or Conrail.

As did the district court, we use the stated intent of the parties in the purposes clause of the agreement to interpret the jurisdictional provision found in paragraph (B) of the agreement. The intent to promote uniform and consistent results of arbitration of title V cases, combined with the creation of a board to hear only these

---

1. In declining to reach this issue we note that the consequences of doing so are reduced by the 1981 repeal of title V, including § 507. *See* section 1144(a)(2)(B) of the Omnibus Budget Reconciliation Act, Pub.L. 97–35, 45 U.S.C. § 771 note. This Act replaced title V of the RRRA with a new title VII which provides for arbitration of disputes but does not distinguish between section 3, First and Second as did the former statute. *See* 45 U.S.C. § 797m (Supp.V 1981). The correct interpretation of section 507 is important only to the declining number of pre-1981 grievances still governed by former title V.

claims, leads us to the conclusion that exclusive jurisdiction was granted by the agreement. This interpretation comports with the interpretive maxim which calls for giving effect to all the language of the agreement, if possible, and also with the maxim calling for reading substantive provisions in light of the result known to be sought by both parties. "When it becomes clear that the parties intended to produce a specific factual result, interpretation should be affected by reasonable and necessary implications, so that the legal effect then given to the instrument will be such as to attain the intended factual result." 3 Corbin on Contracts § 545 (1960). Uniformity and consistency, the "intended factual results" of this agreement, are most likely to come about by having all title V claims heard by Special Board 880.

Conrail does not challenge the district court's finding of exclusive jurisdiction, but the ATDA makes several arguments why the district court erred in its interpretation of the agreement. Three of these may be readily dismissed. The ATDA first argues that the district court reached its conclusion that the agreement gave exclusive jurisdiction without argument by the parties. Since the union had the opportunity to brief the issue and argue it to this court, we conclude that any prejudice caused it by the district court's action has been removed. Second, the ATDA argues that these are not title V disputes and so the question of exclusivity need not have been reached at all. This contention obviously falls in light of our holding that these are title V claims. The union's third argument is that paragraph (B) of the agreement does not vest exclusive jurisdiction in Special Board 880, but merely provides that it can hear only title V disputes. The district court's finding of exclusive jurisdiction was not premised on paragraph (B) alone, but rather on paragraph (B) read alongside the purposes clause of the agreement. We reiterate that on this basis the district court correctly found that the parties intended to give exclusive jurisdiction to Special Board 880.

The ATDA's fourth argument is that the district court's fear that inconsistency would result from not giving all title V cases to Special Board 880 arose from an error of fact. In its opinion the district court notes that NRAB panels might be drawn from all 34 members, leading to inconsistency because of the number of different panels possible, while Special Board 880 consists of only five members. In fact, the ATDA notes in its brief, section 3, First (h) of the RLA provides that the Third Division of the NRAB, which arbitrates disputes involving train dispatchers, consists of only ten members. 45 U.S.C. § 153, First (h). Furthermore, we note that the statute provides that the Third Division sits as a panel of all ten members, and thus there is no possibility of divergent results because of diverse panels.

The ATDA contends that we should reverse the district court because the risk of divergent results is not as great as the district court believed. The problem with this position is that in spite of its mistake of fact concerning the number of NRAB members involved, the district court correctly interpreted the intent of the parties in setting up Special Board 880. The district court correctly identified the parties' concerns with uniformity and consistency, and only erred in stating what it felt gave rise to these concerns. Without doubt, the parties at the time they drafted the agreement knew that the 10-member Third Division heard all train dispatcher disputes, but they still included a provision stating their desire that results be uniform and consistent. The ATDA does not claim that the parties themselves were unaware of the facts at the time they executed the agreement setting up Special Board 880, and the district court's mistake of fact as to the parties' motivation does not affect the validity of its conclusion as to their intent.

The union next contends that the statutory right to present grievances to the NRAB cannot be taken away by agreement between the ATDA and Conrail. The union does not base this argument upon the language of either section 3, First or Second of the RLA. We note that nothing in these

statutes appears to forbid exclusive reliance on a special board. In fact, section 3, Second could be read to contemplate agreements ousting the NRAB by providing procedures whereby one of the parties to a special board may terminate the agreement and arbitrate his grievances before the NRAB. 45 U.S.C. § 153, Second. So read, such termination provisions would not be necessary if agreements not to arbitrate before the NRAB were void ab initio.

The ATDA relies upon three cases to support the proposition that such agreements are always invalid. *General Committee of Adjustment v. Burlington Northern, Inc.,* 563 F.2d 1279 (8th Cir.1977), *cert. denied,* 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980), actually held that railroad employees cannot be compelled to present their grievances to a union-employer arbitration panel on which their own union does not sit. Instead, the court held that the employees could take their grievances to the NRAB or to a special board, where their own union could most effectively represent them. Nowhere does *General Committee* hold that a union cannot consent to have disputes heard exclusively by a special board rather than the NRAB. *Slagley v. Illinois Central Railway Co.,* 397 F.2d 546, 551 (7th Cir.1968) does hold that the employee's right to present grievances to the NRAB cannot be nullified by agreements between the union and the carrier. This passage is taken out of context and does not refer to the power to send disputes exclusively to a special board established under section 3, Second of the RLA. In fact, the court appears to concede the existence of this power in the paragraphs following the one cited by the ATDA. The impermissible agreements to which *Slagley* refers are of two types. The first is a union's collusive or unconsensual settlement of an employee's claim, or other refusal to take a claim to arbitration. *Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 740 n. 39, 65 S.Ct. 1282, 1298 n. 39, 89 L.Ed. 1886 (1945), *aff'd on rehearing,* 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). The second type of impermissible

agreement is the type we have already distinguished in *General Committee, supra,* where an employee is compelled to arbitrate before a board on which his own union is not represented. *McElroy v. Terminal Railroad Ass'n,* 392 F.2d 966 (7th Cir.1968), *cert. denied,* 393 U.S. 1015, 89 S.Ct. 611, 21 L.Ed.2d 559 (1969). Neither of these principles has any application to the issue we face here.

The last of the three cases, *Baltimore & Annapolis Railway Co. v. National Mediation Board,* 321 F.Supp. 51 (D.Md.1970), holds that an agreement specifying that disputes may be instituted "before the appropriate division of the National Railroad Adjustment Board" does not impliedly exclude a special board from being set up to hear cases, in light of Congress' intent that special boards be available in order to clear away the backlog facing the NRAB. Toward the end of the opinion the court does state in dictum that the parties could not agree to waive recourse to the NRAB, citing four cases. Two of them, *Slagley* and *Burley,* we have already distinguished. In *Johnston v. Interstate Railroad,* 303 F.Supp. 138 (W.D.Va.1969), the district court declined to enforce a provision in a labor agreement purporting to allow employees to bring grievances in federal court, stating that mandatory statutory arbitration could not be circumvented by such agreements. *Dominguez . v. National Airlines,* 279 F.Supp. 392 (S.D.N.Y.1968), holds only that an employee dissatisfied with the results of arbitration by a section 3, Second board may not relitigate his claim in federal court. None of these cases stand for the proposition that an agreement to arbitrate solely before a section 3, Second special board, as opposed to the NRAB, cannot be valid, and we decline to follow the district court's opinion in *Baltimore & Annapolis Railway Co.* to the extent it holds otherwise.[2]

The ATDA's final contention is that vesting exclusive jurisdiction in Special Board 880 will deprive the affected dispatchers of

---

**2.** We note that our holding refers only to the power of the union *qua* union to enter into

agreements exclusively to arbitrate before a special board.

a forum in which to arbitrate their claims. This contention appears to have two parts. The first is that because the agreement setting up Special Board 880 limits it to title V claims, the Board cannot decide whether Conrail violated section 3–G–1 of the labor agreement. The terms of the agreement establishing Special Board 880 do not sustain this position. The agreement provides in paragraph (I) that the board "shall have jurisdiction to make determinations upon all matters, procedural and/or substantive, involved in any dispute or controversy submitted to it pursuant to Paragraph (B) of this Agreement." Furthermore, paragraph (J) provides that the board shall make findings of fact in each case, a function incompatible with a board limited to deciding solely legal issues under title V. Given these provisions of the agreement, we are unwilling to hold that Special Board 880 does not have jurisdiction to decide the labor agreement claims as incident to the title V issue.

The second part of the ATDA's loss-of-forum argument is that Conrail may take advantage of the 1981 repeal of title V by arguing that there is no longer a title V and so nothing for Special Board 880 to decide. This is purely speculation on the ATDA's part, inasmuch as Conrail has not taken this position in its brief or at oral argument. It appears, too, that this tactic is not available. Section 1144(a)(2)(B) of the Omnibus Budget Reconciliation Act of 1981, which repealed title V, provided that claims which arose before the effective date of the repeal would continue to be decided under the terms of former title V. *See* 45 U.S.C. § 771 note. Thus the title V issues remain to be decided, and Conrail cannot evade its obligation to arbitrate by relying on the repeal of title V.[3]

### IV

The order of the district court vacating NRAB Awards Nos. 23174 and 23175, and declining to set aside Award No. 23193, will be affirmed.

---

**3.** No question of the application of the termination provision of section 3, Second of the RLA

---

to a board established pursuant to section 507 of the RRRA is present in this case.