Pamela **PRINCE**, Plaintiff,

v.

**AMERICAN AIRLINES, INC., The Association of Professional Flight Attendants, The Republic National Bank of Dallas, and John Hancock Mutual Life Insurance Company, Defendants.**

No. 84 Civ. 4439 (GLG).

United States District Court,
S.D. New York.

Oct. 13, 1987.

---

Pamela Prince, New York City, pro se.

Bigham, Englar, Jones & Houston, New York City, for defendant American Airlines; Robert E. Hirsch, of counsel.

George S. Maxwell, Bay Shore, N.Y., for defendant The Ass'n of Professional Flight Attendants.

## DECISION

GOETTEL, District Judge:

The plaintiff was a flight attendant with defendant American Airlines ("the Airlines") and was a member in good standing with the Association of Professional Flight Attendants ("the Union") (both being the named defendants in this action).[1] Her employment was governed by a Collective Bargaining Agreement between the Airlines and the Union.

On June 1, 1981, while employed aboard a flight from New York to Puerto Rico, the plaintiff sustained a physical injury due to turbulence. For several months, she was carried by her employer as being out because of an injury on duty. The plaintiff initially was reluctant to get medical attention. Her employer took her off the injured-on-duty status and placed her on sick leave, which diminished her benefits under

---

**1.** A third defendant, The Republic National Bank of Dallas, is apparently a trustee of the Airlines pension funds and as such is merely a nominal party. A fourth defendant, John Hancock Mutual Life Insurance Company, was dropped some time ago.

the collective bargaining agreement then in effect between the Airlines and the Union. Her original orthopedic injuries seemed to resolve themselves over time, although she still has some residual complaints, however she has had some severe emotional problems. During this period, the plaintiff had a workers' compensation claim pending. The workers' compensation insurer took the position that at some point in time her disability ceased to be employment related.

On February 5, 1982, the plaintiff filed a grievance with her Union. In March, a first level grievance hearing was held and the Airlines rejected her complaint.[2] Since the question of whether her emotional illness was related to her employment accident was central to both the compensation proceeding and the Union grievance proceeding, the Union and the employer agreed to delay the grievance proceeding. The evidence established that this is a customary procedure, but plaintiff continued to insist on a hearing since her fringe benefits, particularly health insurance, depended on whether her illness was work related. It took a couple of years to get a ruling from the Workers Compensation Board. When it did rule, it found in her favor and she has apparently received $1,134 for each month since she sustained her injuries six years ago.[3] She has also received Social Security disability benefits and long term disability benefits from a private group insurance policy provided by her employer.[4]

While the workers' compensation claim was pending, the plaintiff instituted this action,[5] suing under the Labor Management Act (a hybrid section 301 suit), the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* In addition to seeking benefits due under the collective bargaining agreement, the plaintiff also sought damages for mental and emotional distress involved in obtaining her compensation. The Union grievance, which involved more than the workers' compensation claim (such things as insurance and other fringe benefits) was then reopened.

On November 6, 1985, following the scheduling of a second level grievance procedure in New York, the Airlines paid plaintiff a gross sum of $13,013.66 in satisfaction of that grievance. Because that did not settle the pending litigation, the Union insisted upon keeping the grievance open albeit no further proceedings have occurred during the last two years.

A nine day trial of this action was held. Numerous witnesses were called and voluminous exhibits introduced.[6] While the trial was overly long, it did give considerable insight into the plaintiff's rather unique complaint.

The plaintiff had served as an airline flight attendant (formerly known as stewardess) for 22 years. During most of this time, the employment relationship was mutually satisfactory. However, in the 1970's, some problems developed. Initially, she had a slight overweight problem. She corrected this so successfully that she soon was found to be underweight. The Airlines' medical staff was after her to raise her weight. Some disagreement arose over the nature of the problem which the Air-

2. The grievance process consists of three possible levels. The second level of hearings normally is conducted in Dallas–Fort Worth, Texas, the Airlines headquarters. The plaintiff desired a hearing in New York, claiming she was too ill to travel. This became a factor delaying further proceedings at a later time.

3. The plaintiff also filed a discrimination claim with the Board, alleging that she had been discriminated against in retaliation for filing workers' compensation claim. That claim was denied.

4. These various benefits do not cumulate. The group insurance payments are intended to be net of the others. (Because of clerical error by the Airlines' benefit department she was substantially overpaid on the long term disability by their failure to deduct other sources.)

5. The preceding year she commenced an action in New York State Supreme Court, New York County, against these and other defendants. The present status of that action is unclear.

6. Most of the witnesses and exhibits were introduced by the plaintiff who appeared at trial *pro se.* (She started the action with counsel but he withdrew at an earlier time.) Because of plaintiff's lack of legal training, most of the evidence she offered was adverse to her position.

lines now contends was anorexia nervosa. In any event, the plaintiff took several years personal leave while dealing with her problem. When she returned to duty during the late 1970's, some additional problems developed. The first was a fall in the snow, which was unrelated to her employment but which caused her to be out of work for more than a month. She thought her wrist and leg were broken. She retained a lawyer but only made a small recovery. The following year she had a minor on-the-job accident which kept her out for several weeks. The year after that, some passengers sued the Airline concerning allegedly unsatisfactory service. A disciplinary proceeding was apparently commenced but with Union assistance she obtained the removal of any criticism of her behavior from her file. It is apparent that she was finding the job of flight attendant more onerous and less glamorous than it had been in her youth, particularly the long international flights. Notwithstanding the foregoing, she continued to be a satisfactory worker until the accident of June 1, 1981.

The accident occurred when the plane hit unexpected clear air turbulence. The Captain was on his way to a lavatory at the time and the flight attendants were dealing with food and beverage carts. Several of the flight attendants, as well as some of the passengers, were violently thrown about. They suffered physical injuries of varying degrees. The Airlines apparently did not perceive of either the accident or plaintiff's physical injuries as being of any major consequence. Almost from the outset, she had a feeling that they were not adequately responding to her condition. She reacted by becoming reclusive and refusing their directions concerning the need for medical care. When she did get medical assistance, the doctor's reports concerning her physical injuries tended to be equivocal. A hostility developed between the plaintiff and her supervisors as her absence from work became prolonged without any supporting medical justification. While plaintiff was immediately and understandably emotionally distressed about her physical injuries, this employment conflict

deepened and increased her emotional problems. She did then seek psychiatric assistance, but her psychological condition continued to deteriorate. As described in the decision of the Social Security Administration awarding disability insurance benefits:

Since her injury the claimant has also complainted [sic] of anxiety and depression. Kent Shinbach, M.D. reported in April 1982 that he has been treating the claimant due to anxiety and depression. He reported that since her injury, the claimant's personal habits, daily activities, interests and manner of relating to others have been severely restricted. He noted that t[h]e claimant has been uncooperative with treatment due to her psychiatric condition.

A consultative psychaiatric [sic] examination by Frederick Zuckerman, M.D. in April of 1982 revealed an individual who appeared 30 years older than her stated age. The psychiatrist noted that the claimant was obviously severely depressed. It was noted that the claimant was unable to complete sentences. Her affect was flat and she was severely preoccupied. The claimant was unable to recall or state things. She had great difficulty producing speech. Attention and concentration were disturbed. The diagnosis was psychotic depressive reaction. Another consultative psychiatric examination was conducted by Dr. Baker in July 1982. Dr. Baker noted that the claimant was extremely emaciated and shabbily dressed. The claimant's speech was vague and hesitant. Her responses were relevant [sic] and she had difficulty with her memory. It was noted on mental status examination that the claimant had no friends. She depended upon her sister for assistance with activities of daily living. The diagnosis was chronic undifferentiated schizophrenia with conversion and dissociative features. It was felt that the claimant's personal, social and occupational adjustment was poor. M. Olehansky, M.D. reported in July 1982 that he had been treating the claimant on a psychiatric basis since June 1982. He reported that the claimant's

symptoms including fearfulness, confusion, bizarre ideation and seclusive. There was deterioration in her personal habits. The psychiatrist noted that the claimant essentially never leaves her own apartment. He concluded that the claimant was a marginally compensated schizophrenic. He was of the opinion that the claimant was severely impaired in all areas of functioning. (Exhibit numbers omitted.)

The psychiatrists' diagnoses of the plaintiff's problems have not been uniform. For example, she obtained her own psychiatric evaluation (for possible use in this litigation) which diagnosed her as having an "adjustment disorder with disturbance of mood." It is generally conceded, however, that regardless of how categorized, the plaintiff has been suffering a severe emotional disturbance during the past six years. It has been the Court's observation, however, that during the last year or two, as she has taken over the management of the litigation herself, she has shown significant improvement. The plaintiff attributes her psychological difficulties solely to the actions of the defendants with respect to the benefits she sought as a result of the employment injury.

The significant factual issue in this case, therefore, is the cause of the psychological and emotional disturbances experienced by the plaintiff during the last six years. The Court finds their original cause to have been an innate psychological vulnerability of the plaintiff activated by the accident of June 1, 1981. This finding is consistent with the Workers Compensation Board memorandum decision which, based upon the testimony of psychiatrists and other doctors, found that the plaintiff "has a marked partial causally related disability both of a physical and psychiatric nature subsequent to September 3, 1981." [7]

It is probable that her emotional disturbances have been increased by her claims conflicts with the defendants. However, the aggravation of the plaintiff's emotional problems was not due solely to her conflicts with the defendants. She has had lingering physical ailments due to the accident which have not corrected themselves. For example, she has difficulty in remaining seated for extended periods of time. Indeed, while the Airlines' long-term disability plan is limited to two years of benefits for psychiatric disability, they have continued payments to her because her physical injuries continue to contribute to her psychological state.

The benefit package provided by the Airlines and the bargaining agreement are extremely generous. However, they are also quite complex and many of them depend upon the cause of an illness or disability. The Airlines was not particularly helpful or sympathetic in attempting to assist the plaintiff in understanding what benefits she was entitled to and how to receive them. Eventually, she got legal advice and the matters were clarified, but they were a long time in being resolved because of the joint decision of the defendants to await the outcome of the workers' compensation proceeding. This lengthy delay constitutes the major component of plaintiff's complaint. The Airlines desire to await the outcome is understandable. The Union officials testified that they agreed to this policy since the workers' compensation proceedings are more likely to result in a favorable decision to the employee than is the Union grievance-arbitration proceeding, and that it is usually completed more rapidly. That may be generally true, but as it impacted on this particular claimant, she needed substantial assistance in dealing with fringe benefits, and, in particular, medical insurance.[8]

---

**7.** September 3, 1981 was the date on which she was taken off full-pay status as having been injured on duty by the Airline.

**8.** Because the workers' compensation insurance carrier was disputing the causality of her disability, it would not pay for her medical benefits. Her medical insurance would have provided coverage for sickness benefits, but it required

the plaintiff to submit a form stating that in the event she prevailed in the workers' compensation proceeding, thereby obtaining coverage, she would reimburse the medical insurance carrier. The plaintiff refused to sign such a form, claiming she was not adequately advised as to the necessity of it. Eventually, the insurance com-

■ The Airlines argues that the plaintiff cannot proceed on any of her claims since she has not exhausted the grievance procedures of the collective bargaining agreement. We cannot agree with this argument. Realistically, the grievance procedures were finished in 1985. Keeping them open without further proceedings cannot bar the continuation of a litigation. (They can, of course, be pursued now that this litigation has been completed, if there is any open grievance to be resolved.)

■ Because most of the plaintiff's injuries and damages are directly and causally related to the accident, her exclusive remedy as to them is the workers' compensation benefits which she is already receiving. *O'Rourke v. Long*, 41 N.Y.2d 219, 391 N.Y. S.2d 553, 359 N.E.2d 1347 (1976); *Pahmer v. Hertz Corp.*, 36 A.D.2d 252, 319 N.Y.S. 2d 949, *aff'd* 32 N.Y.2d 119, 343 N.Y.S.2d 341, 296 N.E.2d 243 (1971). To the extent that plaintiff proffers other claims, there appears to be little jurisdictional basis for awarding damages as to them.

■ One legal basis for her claims is Section 301 of the Labor Management Relations Act. However, that Act specifically exempts matters subject to the provisions of the Railway Labor Act. The Railway Labor Act provides, in turn, for compulsory arbitration for all provisions imposed in collective bargaining agreements. 45 U.S. C. § 153. The grievance proceedings appear to be the exclusive remedy available to the claimant. *Andrews v. Louisville & Nashville Railroad Company*, 406 U.S. 320, 325, 92 S.Ct. 1562, 1565, 32 L.Ed.2d 95 (1972).

■ Even if the plaintiff could pursue a Union grievance, she would have to establish that the Union breached its duty of fair representation by "substantial evidence of discrimination that is intentional, severe and unrelated to legitimate objectives...." *Amalgamated Ass'n v. Street, Elec. Ry. & M.C. Employees v. Lockridge*, 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971). A Union breaches its duty of fair representation only when its conduct is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). We do not find that the Union's conduct in this matter approaches that standard. The Union is a weak one with small monthly dues and few paid full-time employees. There is no business manager in New York to pursue problems such as this. While the Union was neither effective nor overly helpful in obtaining assistance for the plaintiff until 1985, it was not discriminatory or acting in bad faith.

■ The plaintiff also attempts to sue under the Employees Retirement Income Security Act of 1974 for delay in processing her benefit claims. The Supreme Court has held, however, that a beneficiary does not have a private cause of action under Section 409(a) of E.R.I.S.A. for extra contractual damages caused by such delays. *Mass. Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985).

In the final analysis, the plaintiff has received all of the specific benefits to which she was entitled,[9] with one exception. Workers' compensation awarded her approximately $2,300 in disputed dental bills, but withheld payment because of the pendency of this case. Since we assume that the ending of this case will result in those benefits being paid, we award no judgment thereon.

■ Her real claim here is for "compensation neurosis," the extent to which her psychological problems have been exacerbated by her difficulties and delays in obtaining her benefits. It is not entirely clear that the law of New York recognizes such a claim. To the extent that it may be the equivalent of a *"prima facie* tort" (*i.e.,* intentional infliction of harm), plaintiff has failed to prove that anyone acted intentionally to harm her. The Airlines supervisors and employees' benefits personnel were un-

---

pany started paying her medical claims without the reimbursement promise.

**9.** She points to $100 or $200 of miscellaneous expenses for cabs, etc., which she claims she should have additionally received, but her entitlement to this de minimus amount was not established either factually or legally.

doubtedly bureaucratic.[10] After a period of time, they grew short-tempered in dealing with the plaintiff, who at times was clearly irrational, but their actions did not amount to the intentional infliction of harm.[11] As noted above, the Union officials were merely ineffective, not malicious.

It would totally emasculate the workers' compensation laws were an injured employee, who suffers both physical and psychological injuries from an on-the-job accident, able to sue additionally for the emotional travail involved in pursuing a workers' compensation claim. While the plaintiff ultimately prevailed in her claims, there was at least a good faith basis for questioning whether her psychological problems grew out of her on-the-job injury. She is not entitled to additional damages because the defendants questioned her claim. The defendants are entitled to judgment, dismissing the plaintiff's complaint. The Clerk will enter such judgment.

SO ORDERED.

---

**10.** They made several errors in dealing with her claims. However, on a couple of occasions, their errors were substantially in her favor, paying benefits in excess of those to which she was entitled.

**11.** In addition, the plaintiff has neither pleaded nor proved special damages as is required in an action for *prima facie* tort. *Curiano v. Suozzi,* 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984). Moreover, to the extent she is claiming punitive damages, such are not recoverable in an action against a Union for breach of duty of fair representation. *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 52, 99 S.Ct. 2121, 2128, 60 L.Ed.2d 698 (1979).