T.J. GENDRON, Indiv. and on behalf of all others similarly situated, *et al.*, Plaintiffs-Appellants, v. CHICAGO & NORTH WESTERN TRANSPORTATION COMPANY *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—88—1630

Opinion filed October 30, 1989.

O'CONNOR, J., dissenting.

Schopf & Weiss, of Chicago, and Timothy D. Kelly and Cindy J. Larson, both of Minneapolis, Minnesota (Steven A. Weiss and Arthur J. Howe, of counsel), for appellants.

Harold C. Hirshman and Jeffrey L. Dorman, both of Sonnenschein, Carlin, Nath & Rosenthal, and James P. Daley, Stuart F. Gassner, and Myles L. Tobin, all of Chicago & North Western Transportation Company, both of Chicago, for appellee Chicago & North Western Transportation Company.

Susan Getzendanner and Eileen A. Kamerick, both of Skadden, Arps,

Slate, Meagher & Flom, of Chicago, for appellee Fox River Valley Railroad Corporation.

JUSTICE QUINLAN delivered the opinion of the court:

This appeal is brought by creditors of a railroad to enjoin the sale of a portion of the railroad as a fraudulent conveyance and for damages occasioned by the fraudulent conveyance. The trial court entered judgment dismissing plaintiffs' complaint on the basis that it was preempted by the minor dispute provisions of the Railway Labor Act (RLA) (45 U.S.C. §151 *et seq.* (1982)), and by the Interstate Commerce Act (ICA) (49 U.S.C. §1001 *et seq.* (1982)). The trial court also held that Illinois common law preempts plaintiffs' claim of civil conspiracy. We affirm.

Defendant Chicago and North Western Transportation Company (C&NW) is one of the nation's largest rail systems. Defendant Fox River Valley Corporation (FRVR) was incorporated in September 1987 for the purpose of acquiring 208 miles of Wisconsin rail line and incidental trackage rights from C&NW (Duck Creek South Line).

Plaintiff T.J. Gendron (Gendron) is an employee of C&NW and alleges that he is a creditor of C&NW. Plaintiff Railway Labor Executives' Association (RLEA) is a voluntary, unincorporated association of the chief executive officers of the standard national and international railway unions in the United States and alleges that it also is a creditor of C&NW.

In late 1987, C&NW and FRVR began negotiating C&NW's sale of the Duck Creek South Lines and certain other trackage rights to FRVR. As part of the transaction, FRVR is to receive trackage rights over C&NW lines and C&NW has reserved an easement over FRVR lines. C&NW is to receive $61.1 million from the sale and will continue to operate as a Class I railroad.

On December 23, 1987, C&NW and FRVR filed with the Interstate Commerce Commission (ICC or Commission) a notice of exemption, seeking approval of the sale and requesting clarification of the Commission's jurisdiction over labor issues arising from line sale transactions.

On January 29, 1988, the Commission granted defendants a license exemption, giving defendants authority to proceed with the sale. On February 19, 1988, the RLEA filed a petition for revocation of the exemption from regulation. At the time this appeal was filed, that petition was still pending before the Commission.

Prior to the granting of the license exemption, on January 22, 1988, plaintiffs filed a three-count complaint in the circuit court of

Cook County.

The complaint alleged that the sale constituted a fraudulent conveyance under Illinois law and was the product of a civil conspiracy. The complaint sought to enjoin the sale or to create a lien on the track to be sold, other injunctive relief and damages.

In their complaint, plaintiffs alleged that C&NW's purpose in making the sale to FRVR was to avoid the cost burden of ownership, including continuing to pay plaintiffs' wages and benefits. Plaintiffs claim that the transaction is a highly leveraged buyout and that C&NW will use the proceeds of the sale to pay favored creditors or to pay dividends or other benefits to its shareholders rather than addressing plaintiffs' debts. It also alleges that FRVR will be left dangerously undercapitalized, with the bulk of its assets pledged as security for the benefit of persons other than the plaintiffs.

On February 1, 1988, C&NW and FRVR filed a petition for removal under 28 U.S.C. §§1441 and 1446 and the case was removed to Federal court. Plaintiffs filed a motion to remand, and defendants filed a joint motion to dismiss, asserting that plaintiffs' causes of action were preempted by the RLA and ICA. The Federal district court held that neither the RLA nor the ICA was a complete preemption statute and, thus, did not give rise to Federal removal jurisdiction.

Upon remand to the circuit court, defendants moved to dismiss the complaint as preempted by the RLA and ICA. The trial court granted the motion to dismiss and plaintiffs now bring this appeal.

The principal issue on appeal is whether plaintiffs' causes of action under the Illinois fraudulent conveyance act (Ill. Rev. Stat. 1987, ch. 59, par. 4) are preempted by the Railway Labor Act and the Interstate Commerce Act. Plaintiffs' contention is that their fraudulent conveyance action is not a "minor dispute" within the meaning of the Railway Labor Act and, therefore, the claim is not subject to the exclusive jurisdiction of the National Railway Adjustment Board (NRAB). Defendants argue that the plaintiffs' contentions are in fact matters within the collective-bargaining agreement and are accordingly a minor dispute within the Railway Labor Act. Furthermore, the defendants assert, the plaintiffs' claims here are preempted by the Interstate Commerce Act.

■■ Congress enacted the Railway Labor Act in an effort to promote stability in labor-management relations by providing "effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements." (*Union Pacific R.R. Co. v. Sheehan* (1978), 439 U.S. 89, 94, 58 L. Ed. 2d 354, 359, 99 S. Ct. 399, 402 (*per curiam*).) More specifically, the

RLA was enacted to prevent disruption in rail service by providing for the prompt and orderly settlement "of all disputes concerning rates of pay, rules or working conditions" and "all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions." 45 U.S.C. §151a (1982).

■ Labor disputes under the RLA are classified as either "major" or "minor." A "major dispute" involves the acquisition of new rights, such as the formation of a collective-bargaining agreement or changes to an existing agreement. (See *Gregory v. Burlington Northern R.R. Co.* (D. Minn. 1986), 638 F. Supp. 538, 541, *aff'd* (8th Cir. 1987), 822 F.2d 1092.) A "minor dispute," which defendants assert is what is at issue here, involves the interpretation or application of existing contracts. *Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co.* (1957), 353 U.S. 30, 33, 1 L. Ed. 2d 622, 625, 77 S. Ct. 635, 637.

■ The exclusive remedy for "minor disputes" is the Federal dispute resolution procedure set forth in RLA section 3 First (45 U.S.C. §153 First (1982)), which requires that such disputes must be pursued initially through the railroad's internal procedures, and, if not resolved there, may be submitted to a division of the National Railroad Adjustment Board (NRAB). (See *Atchison, Topeka & Santa Fe Ry. Co. v. Buell* (1987), 480 U.S. 557, 94 L. Ed. 2d 563, 107 S. Ct. 1410.) Exclusive jurisdiction over "minor disputes" is vested with the NRAB because of the Board's administrative expertise in interpreting collective-bargaining agreements and because of the importance of uniform administrative interpretation of such agreements. *Pennsylvania R.R. Co. v. Day* (1959), 360 U.S. 548, 551-52, 3 L. Ed. 2d 1422, 1426, 79 S. Ct. 1322, 1324.

■ In our view, plaintiffs' claims in this case are substantially related to the rights and obligations embodied in the collective-bargaining agreement and would, of necessity, require interpretation of the agreement. Therefore, we agree with defendants' argument that the RLA preempts plaintiffs' fraudulent conveyance action and provides the sole and exclusive remedy for plaintiffs' claims here.

Our supreme court recently considered a similar issue in *Koehler v. Illinois Central Gulf R.R. Co.* (1985), 109 Ill. 2d 473, 488 N.E.2d 542. There the court determined that any claim involving a State tort claim is preempted by the RLA regardless of the nature of the claim.

In *Koehler*, the supreme court found in pertinent part:

"The RLA is an elaborate and extensive administrative scheme. (45 U.S.C. secs. 151 through 163 (1982).) Under *** [which] 'dis-

putes *** growing out of grievances' are to be resolved in the first instance by the parties. If the parties are unsuccessful, the RLA provides that the dispute be referred to the National Railroad Adjustment Board for resolution. (45 U.S.C. sec. 153 First (i) (1982).) Decisions of the Adjustment Board are final and binding. (45 U.S.C. sec. 153 First (m) (1982).) Under the RLA, a party dissatisfied with a decision of the Adjustment Board may obtain limited review in Federal district court with appeal to the court of appeals. (45 U.S.C. sec. 153 First (q) (1982).) The RLA does not accord original jurisdiction over employment-related disputes to either Federal or State courts. Original, exclusive jurisdiction is given to the Adjustment Board. (45 U.S.C. sec. 153 First (i) (1982).) ***

[Hence] [o]ur review of the RLA indicates that plaintiff's [tort] suit for retaliatory discharge is precluded as an 'undue interference' with the dispute-resolution scheme of the RLA. Stripped to its essentials, plaintiff's suit is a reformulation in tort of his grievance which, as the record shows, fell within the purview of the RLA. Allowing plaintiff's suit to proceed would allow a State court, applying State law, to resolve 'disputes *** growing out of grievances.' (45 U.S.C. sec. 153 First (i) (1982).) *** [Such a] result would unduly interfere with the operation of the dispute-resolution machinery of the RLA." *Koehler*, 109 Ill. 2d at 479-80, 488 N.E.2d at 545-46.

The court there concluded:

"*A thorough reading of the RLA makes clear Congress' intent that employment-based disputes between parties covered by the RLA are to be resolved exclusively pursuant to the Act. Under the RLA, State courts have no jurisdiction to hear and resolve such disputes.* (45 U.S.C. secs. 153 First (i), (q) (1982).)" (Emphasis added.) *Koehler*, 109 Ill. 2d at 479-80, 488 N.E.2d at 545-46.

The plaintiffs argue, however, that *Koehler* must be reexamined because of the *Lingle v. Norge Division of Magic Chef, Inc.* (1988), 486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877, decision, in which the Supreme Court held that a State retaliatory discharge claim was not preempted under section 301 of the Labor Management Relations Act (LMRA) (29 U.S.C. §185(a) (1982)). We do not find this argument persuasive. In fact, our supreme court, prior to *Lingle*, considered a similar issue in *Gonzalez v. Prestress Engineering Corp.* (1986), 115 Ill. 2d 1, 503 N.E.2d 308, and found that although a claim for retaliatory discharge was not preempted by section 301 of the LMRA, this did not

have any bearing on its prior decision in *Koehler*. The court specifically noted that its decision in *Koehler* was based not on the LMRA but the RLA, and that, therefore:

> "'Prestress' [the plaintiff's] reliance on *Koehler* *** [was] misplaced. *Koehler* involved the preemptive effect of the Railway Labor Act (45 U.S.C. secs. 151 through 164 (1982)) and is therefore clearly inapposite [to this case, which involves the Labor Management Relations Act (LMRA)]." *Gonzalez*, 115 Ill. 2d at 11, 503 N.E.2d at 313.

Additionally, the Seventh Circuit Court of Appeals, in a related case, which involved these same parties held, addressing essentially the same claims asserted by the plaintiffs here,[1] that the claims were a minor dispute under RLA, and as such, a controversy within the exclusive jurisdiction of the National Railway Adjustment Board (NRAB). (*Chicago & North Western Transportation Co. v. Ry. Labor Executives Association* (7th Cir. 1988), 855 F.2d 1277, 1286.) The court stated:

> "RLEA insists that C & NW does not have a right under the collective bargaining agreements to abolish jobs within the context of a rail line sale and concurrently refuse to negotiate over the effects of that sale on its present employees. ***
>
> *** C & NW contends [on the other hand] that the job abolishment, layoff and reassignment actions it will take as a result of the Duck Creek South line sale are fully authorized by the collective bargaining agreements. ***
> ***
>
> We have carefully evaluated the claims of the parties and examined the evidence in the record as to the terms of their collective bargaining agreements and the relevant past practices attendant to those agreements. There can be no doubt that the agreements and past practice arising thereunder embrace matters of job abolishment, layoff and reassignment resulting from a layoff with regard to the individuals affected by the Duck Creek South line sale who are able to retain their employment with C & NW. ***
> ***
>
> Our analysis leaves us convinced that even though C & NW's

---

[1]The defendant, C&NW, points out in its brief that there have actually been five different attempts to block the sale here by plaintiffs. This is so, it says, because the plaintiff, RLEA, is an unincorporated association composed of railroad unions, and all the various individual plaintiffs are union members; hence, the plaintiffs in this action were previously also represented in all the prior lawsuits as well.

interpretation of the agreements and its contentions are subject to challenge, they are at least plausible. *See Machinists*, 830 F.2d at 748. Because C & NW's position has at least an arguable basis in the collective bargaining agreements and relevant past practice, it cannot be said to constitute the type of clear departure from those agreements necessary to trigger a finding of a §6 major dispute under the RLA format. *See Brotherhood of Maintenance of Way Employees*, 802 F.2d at 1022.

\*\*\*

\*\*\* Therefore, we conclude that the district court correctly determined that because the present controversy is a minor dispute under the RLA, it is subject to the exclusive jurisdiction of the NRAB, and must be resolved under the Act's §3 RLA procedures. 45 U.S.C. §153." *Chicago & North Western Transportation Co.*, 855 F.2d at 1284-86.

Also, the Eighth Circuit Court of Appeals considered the very same issues presented here in *Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1080. The court there held that the State claims based upon the Minnesota common law and the Minnesota Uniform Fraudulent Transfer Act were preempted by both the Railway Labor Act and the Interstate Commerce Act. In determining that the plaintiffs' claims were preempted, the Eighth Circuit Court of Appeals reviewed the nature of the plaintiffs' claims and found:

"The existence and extent of the creditor's rights asserted by Deford [individual plaintiff] and the RLEA \*\*\* can be determined only by interpreting the collective bargaining agreements. Even on the face of the complaint Deford predicates his claims upon entitlements to accrued but unpaid wages, vacation pay, life and health insurance, pension contributions, and severance benefits arising 'pursuant to continuing labor contracts and employee protection agreements.' Similarly, RLEA alleges entitlements 'pursuant to the various collective bargaining agreements.' In fact, all of plaintiffs' allegations regarding 'creditors' rights' and 'creditor obligations' are based entirely upon supposed rights to unspecified and unquantified 'wages, benefits and labor protection' pursuant to the labor agreements. Deford and RLEA further assert as a basis for relief that '[e]mployees who quit would waive their rights under the Labor Agreements.' Indeed, a theme that runs throughout the complaint is the defendants' alleged 'circumvention of the burden of the Labor Agreements for Lake States' employees' through the sale.

\*\*\*

Deford [further asserts] \*\*\* that the Minnesota fraudulent transfer act 'imposes duties and obligations on all creditors completely independent of any collective bargaining agreement.' This statement, however, mischaracterizes the nature of the fraudulent conveyance statute. The \*\*\* Fraudulent Transfer Act is not substantive in nature, but instead merely confers an alternate remedy for protecting preexisting creditor rights. The creditor rights a party seeks to enforce must exist under independent law, such as contract law. *See Brill v. W.B. Foshay Co.*, 65 F.2d 420, 423 (8th Cir.), *cert. denied*, 290 U.S. 643, 54 S. Ct. 61, 78 L. Ed. 2d 558 (1933) (interpreting the Minnesota Fraudulent Transfer Act). The purpose of the statute is to grant creditors additional enforcement possibilities when a debtor transfers his assets to a third party. In this case the creditors rights asserted are based upon the terms of the collective bargaining agreements and the Minnesota statute only provides an additional method for enforcing the terms of the agreements. We therefore affirm the district court's finding that Deford's claims directly involve the collective bargaining agreements and constitute 'minor disputes' under the RLA." *Soo Line R.R. Co.*, 867 F.2d at 1086-87.

The Court summarized its ruling as follows:

"In conclusion, [the plaintiff] is essentially claiming that if the sale of rail lines from Soo Line to Wisconsin Central is not, in effect, unwound, the transaction will result in a breach of Soo Line's obligations under the existing collective bargaining agreements. Thus, by asserting state law claims, [plaintiff] seeks enforcement of the terms of the collective bargaining agreements. The fraudulent conveyance act serves only as an enforcement mechanism. We believe [plaintiff] is only trying to invoke a state law remedy in place of the mandatory and exclusive remedies of the Railway Labor Act, and we therefore affirm the district court's removal of the suit to federal court and its subsequent dismissal of the case." *Soo Line R.R. Co.*, 867 F.2d at 1088.

This is exactly what plaintiffs Gendron and RLEA have attempted to do here. Thus, we believe that under both State law and Federal law, their claims here are also preempted by the RLA.

The plaintiffs, on the other hand, cite *Ry. Labor Executives Association v. Pittsburgh & Lake Erie R.R. Co.* (3d Cir. 1988), 858 F.2d 936 (cited hereafter as *P & LE*) and claim that it warrants a contrary result. We do not agree. First, the Eighth Circuit Court in *Soo Line R.R. Co.* considered the *P & LE* case in its opinion and did not find it

persuasive. We concur with the Eighth Circuit and find its analysis of the issues to be more persuasive. Second, a careful reading of the Third Circuit opinion does not suggest that a different result, *i.e.*, concerning RLA preemption, would be appropriate here. The Third Circuit Court of Appeals in the *P & LE* case merely concluded that the case should not have been removed from the State court, and not that the State court action was not preempted. The court there specifically found that those issues were quite different, stating:

"We conclude that the district court lacked jurisdiction under [the] applicable principles of removal law. As we explicate *** [later], we also conclude that the district court should have addressed the removal issue first and remanded to the state court, leaving the issues of forum preemption for determination by the state court. *** [We also] emphasize that our holding is a narrow one and identify the issues that we leave for resolution by the state court. Among those issues is the question of whether the rules of law provided by the [Pennsylvania Fraudulent Conveyance Act] are preempted by federal law. As we shall see, this 'ordinary preemption' issue concerning the applicable principles of substantive law is distinct from the 'complete preemption' [removal] issue ***." *P & LE*, 858 F.2d at 939.

Moreover, we also concur with the Eighth Circuit's finding in *Soo Line R.R. Co.* that the Interstate Commerce Act so pervasively occupies the field of railroad governance that it completely preempts the State claims here also. We further believe, contrary to the plaintiffs' assertions, that the United States Supreme Court decision in *Chicago & North Western Transportation Co. v. Kalo Brick & Title Co.* (1981), 450 U.S. 311, 67 L. Ed. 2d 258, 101 S. Ct. 1124, also warrants our conclusion that the ICA preempts the asserted State claims here. The plaintiffs attempt to distinguish the present case on the basis that in *Kalo* the Commission there had addressed the merits of the issues raised in the State action, that there is no equivalent remedy under the ICA for an allegedly defrauded creditor, and that the ICC process of revocation of a sale [which is allegedly the remedy available] is not equivalent to State remedies here, because such remedies are only granted in extraordinary circumstances and then only if the national transportation policy is affected. Again, we find the Eighth Circuit Court of Appeals consideration of this issue in *Soo Line R.R. Co.* to be persuasive here. There, the Eighth Circuit rejected similar efforts by the plaintiffs to distinguish the *Kalo* case. That court found such assertions in support of the State-law claims there to be merely a collateral attack upon the ICC's decision to exempt the sale of a portion of the

railroad from regulation under the statute. The Eighth Circuit Court of Appeals held that such an effort to prevent the sale through an action brought in State court under the guise of State law was completely preempted by the ICA. The Eighth Circuit Court of Appeals also found that the United States Supreme Court had reached that same result in *Venner v. Michigan Central R.R. Co.* (1926), 271 U.S. 127, 70 L. Ed. 868, 46 S. Ct. 444, in similar circumstances. The Eighth Circuit there quoted certain portions of that Supreme Court decision which we find to be relevant here. The Supreme Court in *Venner* stated:

> " '[The State claim is] essentially one to annul or set aside the order of the [ICC]. While the [complaint] does not expressly pray that the order be annulled or set aside, it does assail the validity of the order and pray that the defendant [companies] be enjoined from doing what the order specifically authorizes, which is equivalent to asking that the order be adjudged invalid and set aside.' " *Soo Line R.R. Co.*, 867 F.2d at 1091, quoting *Venner*, 271 U.S. at 130, 70 L. Ed. at 869, 46 S. Ct. at 445.

This, again, is exactly what the plaintiffs here attempt to accomplish by the asserted State claims in this case. Consequently, we find the above authorities to be relevant, persuasive, and controlling. Thus, we must also conclude that the plaintiffs' State claims are additionally barred by the exclusivity of the provisions of the ICA, as well as those of the RLA.

■ Finally, we concur with the trial court's determination that plaintiffs' civil conspiracy claim here is also preempted by the decision of the Illinois Supreme Court. In *Bartley v. University Asphalt Co.* (1986), 111 Ill. 2d 318, 489 N.E.2d 1367, our supreme court ruled that Federal labor law preempted Illinois tort claims for retaliatory discharge and civil conspiracy which, we believe, also bars any attempt to plead a civil conspiracy claim here. (*Bartley*, 111 Ill. 2d at 333, 489 N.E.2d at 1374.) The plaintiffs in the present case argue that *Bartley*, too, has been overruled by *Lingle*. We disagree and find *Lingle* inapposite to the situation described in *Bartley*. There, our supreme court held:

> "Although styled as a State tort suit for retaliatory discharge and civil conspiracy, it is clear that plaintiff's complaint alleges a violation of a collective-bargaining agreement ***. ***
>
> *** As such, plaintiff has alleged a violation of 'a duty grounded in Federal statutes, and that Federal law therefore governs his cause of action.' [Citation.]
>
> *** [Plaintiff] argues, however, that the action for civil con-

spiracy is sufficiently independent from the Federal claim so as to avoid preemption. We disagree. An evaluation of plaintiff's cause of action for civil conspiracy reveals that it is 'substantially dependent upon analysis of the terms of [the collective-bargaining] agreement.' [Citation.] *** Thus, plaintiff's State tort claim for civil conspiracy is 'inextricably intertwined with consideration of the terms of the labor contract.' [Citation.]" *Bartley*, 111 Ill. 2d at 330-32, 489 N.E.2d at 1372-73.[2]

It is clear from this language that the court in *Bartley* considered the specific assertions of the plaintiff and found that they were intertwined with the collective-bargaining agreement. Therefore, we believe that the *Lingle* decision does not affect the supreme court's decision in *Bartlett*, since the *Lingle* Court itself held that if the resolution of a State claim depended upon the meaning of a collective-bargaining agreement, the State-law claim was preempted and Federal labor law principles must resolve the dispute. (*Lingle*, 486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877.) As we noted earlier, plaintiffs' claims here are also founded upon alleged rights they obtained under the collective-bargaining agreement. Hence, the plaintiffs' civil conspiracy claim alleging an abridgement of these rights is also preempted under Federal law.

Accordingly, for the foregoing reasons, we affirm the decision of the circuit court of Cook County.

Judgment affirmed.

MANNING, P.J., concurs.

JUSTICE O'CONNOR, dissenting:

In light of *Lingle v. Norge Division of Magic Chef, Inc.* (1988), 86 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877, decided after the order was entered by the trial court below, I respectfully dissent.

---

[2]It is also noteworthy that in *Bartley*, the Illinois Supreme Court rejected a claim by the plaintiffs that the Federal court had found against preemption of the State claim because it had remanded that case back to the State court, as the Federal court did here, finding that there was no basis for removal. Our supreme court there observed that a defense of Federal preemption is not enough by itself to support removal of an action filed in a State court to the Federal court, since such a defense is not a basis for original Federal court jurisdiction. Thus, the supreme court said that the Federal court's decision, which refused to allow removal, had not determined the preemption issue but had merely found, as the Federal court did here, that there was no original exclusive Federal jurisdiction. See *Bartley*, 111 Ill. 2d at 325-27, 489 N.E.2d at 1370-71; see also *P & LE*, 858 F.2d at 939.

I believe that a determination of plaintiffs' claim in this case is substantially independent of rights and obligations embodied in the collective-bargaining agreement, as it requires no interpretation of the agreement. Therefore, I cannot adopt the majority's conclusion that the Railway Labor Act preempts plaintiffs' fraudulent conveyance action and provides the sole and exclusive remedy for plaintiffs' claims here.

In *Lingle*, the Court traced the history of preemption under section 301(a) of the Labor Management Relations Act of 1947 (LMRA) and concluded:

"[E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for §301 pre-emption purposes." (*Lingle*, 486 U.S. at 409-10, 100 L. Ed. 2d at 421, 108 S. Ct. at 1883.)

That this is a practical, straightforward test, which preserves the consistency and integrity of the collective-bargaining process while not interfering with workers' State and Federal substantive rights which are independent of the collective-bargaining process was recognized in *Bettis v. Oscar Mayer Foods Corp.* (7th Cir. 1989), 878 F.2d 192, 196, *Douglas v. American Information Technologies Corp.* (7th Cir. 1989), 877 F.2d 565, 569, and *International Association of Machinists & Aerospace Workers, IAM Local 437 v. United States Can Co.* (1989), 150 Wis. 2d 479, ____, 441 N.W.2d 710, 711. The *Lingle* court went on to state that while a collective-bargaining agreement might contain information on rates of pay and other benefits that a court might resort to in determining damages under a State-law claim, the underlying State-law claim would not be preempted despite the fact that Federal law would govern the interpretation of the agreement with respect to the question of damages. *Lingle*, 486 U.S. at 413 n.12, 100 L. Ed. 2d at 423 n.12, 108 S. Ct. at 1885 n.12.

The majority's response to *Lingle* is that it was decided under section 301 of the Labor Management Relations Act and is therefore irrelevant to the determination of any case brought under the RLA. The majority maintains that under *Koehler v. Illinois Central Gulf R.R. Co.* (1985), 109 Ill. 2d 473, 488 N.E.2d 542, which held that a suit for retaliatory discharge was preempted by the Railway Labor Act, plaintiffs' fraudulent conveyance action is clearly preempted.

While *Koehler* would appear to require that all State tort claims be preempted by the RLA irrespective of the nature of the claim, I be-

lieve that *Lingle* requires us to examine the relationship between the State-law claim and the bargaining agreement in order to determine whether the State tort law "purports to define the meaning of the contract relationship" and is therefore preempted (see *Allis-Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 213, 85 L. Ed. 2d 206, 216-17, 105 S. Ct. 1904, 1912), or is sufficiently independent of the contract that it is not. (*Lingle*, 486 U.S. at 412-13, 100 L. Ed. 2d at 423, 108 S. Ct. at 1885.) Although Koehler states that the RLA preempts "employment-based disputes" (*Koehler*, 109 Ill. 2d at 480), the actual claim at issue in *Koehler* stemmed from a grievance. *Koehler* did not hold that the RLA preempted all State law; it held that a claim for retaliatory discharge was preempted where the suit was simply a reformulation in tort of a grievance. *Koehler*, 109 Ill. 2d at 480.

While the RLA has been held to preempt State-law causes of action if the claim derives from the railroad employment relationship (see, *e.g.*, *Elgin, Joliet & Eastern Ry. Co. v. Burley* (1945), 325 U.S. 711, 722-23, 89 L. Ed. 1886, 1894, 65 S. Ct. 1282, 1289-90; *Leu v. Norfolk & Western Ry. Co.* (7th Cir. 1987), 820 F.2d 825, 831), it is generally recognized that the RLA is not completely preemptive. See, *e.g.*, *Price v. PSA, Inc.* (9th Cir. 1987), 829 F.2d 871, 874-76 (and cases cited therein); *cf. Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1080, 1085.

Various approaches have been used to determine whether a State-law claim is preempted by the minor dispute provisions of the RLA. In *Stephens v. Norfolk & Western Ry. Co.* (6th Cir. 1986), 792 F.2d 576, *mod.* (1986), 811 F.2d 286, the court stated that such claims should be evaluated in the following manner:

> "If the 'action is based on a matrix of facts which are inextricably intertwined with the grievance machinery of the collective bargaining agreement and of the R.L.A.,' exclusive jurisdiction of the NRAB preempts the action." (*Stephens*, 792 F.2d at 580, quoting *Magnuson v. Burlington Northern, Inc.* (9th Cir. 1978), 576 F.2d 1367, 1369).)

In *Allis-Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 85 L. Ed. 2d 206, 105 S. Ct. 1904, the Court held that a dispute must be more than merely "incident to" an employment relationship in order to be preempted. The Court stated:

> "[N]ot every dispute concerning employment or tangentially involving a provision of a collective-bargaining agreement, is preempted by §301 *or other provisions of the federal labor law.*" (Emphasis added.) *Allis-Chalmers*, 471 U.S. at 211, 85 L. Ed. 2d at 215, 105 S. Ct. at 1911.

The *Allis-Chalmers* Court framed the test as "whether the [tort claim] *** confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract." *Allis-Chalmers*, 471 U.S. at 213, 85 L. Ed. 2d at 216, 105 S. Ct. at 1912.

In a section 301 context, then, a court must inquire whether the labor agreement contains provisions governing the conduct that gave rise to the State claim. If it does so, the court must determine whether the State has articulated a standard sufficiently clear so as to avoid consideration of contract provisions and whether the State has shown an intent not to allow its prohibitions to be altered or waived by contract. (*Miller v. AT&T Network Systems* (9th Cir. 1988), 850 F.2d 543, 546-47.) In order to avoid preemption, a claim must be based on a genuine public policy, *i.e.*, one expressed in State statute; and it must pose no threat to the collective-bargaining process. *Young v. Anthony's Fish Grottos, Inc.* (9th Cir. 1987), 830 F.2d 993, 1001.

While I recognize that *Lueck* and *Lingle* were brought under the LMRA and that the RLA and the LMRA differ in certain significant respects, it is clear that the Federal courts frequently rely on the reasoning of cases brought under the LMRA and other labor legislation in reaching results in actions brought under the RLA and vice versa. (See, *e.g.*, *Andrews v. Louisville & Nashville R.R. Co.* (1972), 406 U.S. 320, 323, 32 L. Ed. 2d 95, 99, 92 S. Ct. 1562, 1564 (RLA case relying on LMRA cases); *Leu v. Norfolk & Western Ry. Co.* (7th Cir. 1987), 820 F.2d 825, 830 (concluding that the reasoning of *Allis-Chalmers Corp. v. Lueck*, brought under the LMRA, is applicable to determining whether a cause of action brought under State tort law actually arises under an RLA collective-bargaining agreement); see also *Lancaster v. Norfolk & Western Ry. Co.* (7th Cir. 1985), 773 F.2d 807; *Minehart v. Louisville & Nashville R.R. Co.* (6th Cir. 1984), 731 F.2d 342 (preemption case in context of National Labor Relations Act found applicable in context of RLA). *Lingle*, while brought under the LMRA, relied on the reasoning of *Atchison, Topeka & Santa Fe Ry. Co. v. Buell* (1987), 480 U.S. 557, 94 L. Ed. 2d 563, 107 S. Ct. 1410, an RLA case rejecting a claim that Federal labor law preempted a State statute and holding that a State-law claim can coexist with a Federal labor remedy.

Having concluded that the principles set out in *Lingle* are applicable here, I believe the determinative issue is whether adjudication of a claim under the Illinois fraudulent conveyance act (Ill. Rev. Stat. 1987, ch. 59, par. 4) would require interpretation of the collective-bargaining agreement and therefore be subject to preemption under the RLA. I

believe it does not. In order to state a claim under the fraudulent conveyance act, plaintiffs must set forth sufficient facts from which it can be inferred that plaintiffs are creditors of the railroad making the conveyance and that the transfer of property made between C&NW and FRVR will impair their rights as creditors. Both Gendron and RLEA have alleged that they are creditors of C&NW and that C&NW's purpose in selling track and related property is to avoid the cost burden of paying certain wages and benefits. Whether these allegations state a cause of action for fraudulent conveyance can be evaluated without recourse to the collective-bargaining agreement. They are purely factual questions that pertain to the status of plaintiffs as creditors and the conduct and motivation of the defendant railroads in transferring the property in issue. In my view, the State-law remedy is independent of the collective-bargaining agreement in that "resolution of the state-law claim does not require construing the collective-bargaining agreement." *Lingle*, 486 U.S. at 407, 100 L. Ed. 2d at 420, 108 S. Ct. at 1882.

This result would not conflict with the national policy underlying the RLA, which is to avoid interruption of interstate railway transportation (see *Elgin, Joliet & Eastern Ry. Co. v. Burley* (1945), 325 U.S. 711, 722-23, 89 L. Ed. 1886, 1894, 65 S. Ct. 1282, 1289-90), as there is no suggestion or likelihood that an action brought under a State fraudulent conveyance action would jeopardize the stability of railway transportation. Equally important is that the issues raised by a fraudulent conveyance claim are squarely within the expertise of a court of law and outside the expertise of the National Railway Adjustment Board, whose sole function is to interpret negotiated agreements. (See *Allis-Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 219-20, 85 L. Ed. 2d 206, 220-21, 105 S. Ct. 1904, 1915; *Southern Pacific Co. v. Joint Council of Dining Car Employees, Locals 456 & 582* (9th Cir. 1947), 165 F.2d 26.) The right to pursue a fraudulent conveyance action based on a leveraged buyout is outside the scope of an agreement that could be collectively bargained inasmuch as parties to a collective-bargaining agreement may not contract for something that is illegal under State law nor may they forego rights or obligations provided under State law that are independent of the labor contract. (*International Association of Machinists & Aerospace Workers, IAM Local 437 v. United States Can Co.* (1989), 150 Wis. 2d 479, 441 N.W.2d 710.) In summary, I believe that plaintiffs' fraudulent conveyance action is a State-law claim not subject to preemption under the RLA, as the action requires no substantial interpretation of the collective-bargaining agreement and the right claimed would at most require tangential ref-

erence to the collective-bargaining agreement.

I also am not persuaded that the Interstate Commerce Act preempts plaintiffs' fraudulent conveyance claims. While the majority cites *Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1080, 1091, to the effect that the State-law claim must necessarily be barred as it was brought to annul or set aside a valid ICC order, plaintiffs here have plainly stated that they are not seeking to bar the sale of the Duck Creek South line by attempting to set aside the ICC order. Nor are they seeking labor protective conditions, which they acknowledge that the ICC has the authority to impose on certain rail transactions. (See, *e.g.*, *New York Dock Ry.—Control—Brooklyn Eastern District Terminal* (1979), 360 I.C.C. 60.) Rather, plaintiffs are seeking to bar what they allege to be the fraudulent form of the sale and to ensure that the sale takes place in a manner that does not violate the Illinois fraudulent conveyance act.

The ICA does not have as broad a preemptive scope as certain other legislation related to labor. (See, *e.g.*, *Pilot Life Insurance Co. v. Dedeaux* (1987), 481 U.S. 41, 46-47, 95 L. Ed. 2d 39, 46-47, 107 S. Ct. 1549, 1551-53 (discussing broad preemptive effect of ERISA).) While the ICA provides comprehensive regulation of common carriers by rail in interstate commerce, this regulation focuses primarily on the licensing and pricing of rail services. (See, *e.g.*, 49 U.S.C. §10102 (1982).) Although the ICC has broad powers, it does not regulate every aspect of a railroad's operations, and State action is not necessarily precluded. In short, in the absence of a specific statement of preemptive intent by Congress or persuasive reasons for finding such intent, preemption of State law by Federal statute or regulation is simply not favored. *Hayfield Northern R.R. Co. v. Chicago & North Western Transportation Co.* (1984), 467 U.S. 622, 632-34, 81 L. Ed. 2d 527, 536, 104 S. Ct. 2610, 2616-17; *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.* (1981), 450 U.S. 311, 317, 67 L. Ed. 2d 258, 264-65, 101 S. Ct. 1124, 1130, citing *Florida Lime & Avocado Growers, Inc. v. Paul* (1963), 373 U.S. 132, 142, 10 L. Ed. 2d 248, 257, 83 S. Ct. 1210, 1217.

The jurisdictional section at issue here, 49 U.S.C. §10901 (1982), provides that a newly formed carrier seeking to acquire and operate an existing rail line must obtain the prior approval of the ICC. That section also provides exemptions for certain sales under Class Exemption for the Acquisition and Operation of Rail Lines Under U.S.C. §10901 (1985), 1 I.C.C. 2d 810 (*Ex Parte No. 392*). Under the policy established by *Ex Parte No. 392*, transactions involving the acquisition of railroad lines by noncarriers are automatically exempted from licens-

ing seven days after an application is filed without addressing the financial aspects of the sale or the impact on the railroad's creditors. Nothing under section 10901 addresses the question of whether the ICC should consider the interests of the railroad's unsecured creditors in making an exemption determination; in fact, such considerations are left to State common law. See *Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1080, 1093, (Lay, C.J., dissenting).

The majority relies principally on *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.* (1981), 450 U.S. 311, 67 L. Ed. 2d 258, 101 S. Ct. 1124, in which the Supreme Court held that the Interstate Commerce Act precludes a shipper from pressing a State-court action for damages against a regulated carrier when the Interstate Commerce Commission, in approving the carrier's application for abandonment, has reached the merits of the matters the shipper sought to raise in State court. (*Kalo Brick*, 450 U.S. at 327, 67 L. Ed. 2d at 271, 101 S. Ct. at 1135.) The ruling in *Kalo* specifically focused on the fact that the Commission had already addressed the merits of the issues the shipper sought to raise in the State court and noted that a shipper who was harmed had specific statutory remedies available. Circumstances here are distinguishable from those in *Kalo*, in that here the ICC did not reach the merits of the fraudulent conveyance issue, nor was it required to do so. (See 49 U.S.C. §10901 (1982); *Ex Parte No. 392* (1985), 1 I.C.C. 2d 810.) *Kalo Brick* is further distinguishable in that here, there is no equivalent remedy for a creditor who is defrauded by a fraudulent conveyance of a railroad. The ICC revocation process is not comparable to the statutory remedies noted in *Kalo Brick* in that under *Ex Parte No. 392*, revocations are only granted in extraordinary circumstances that would justify the imposition of labor protective conditions and ICC exemptions are revoked only when regulation is necessary to carry out the transportation policy of section 10101(a). (49 U.S.C. §10505(d) (1982).) Thus, even if the ICC were presented with facts evidencing a fraud on creditors, it would not be required to revoke the exemption and impose regulations absent some interference with national rail transportation policy.

The railroads in their brief also relied on *Ry. Labor Executives' Association v. Staten Island R.R. Corp.* (2d Cir. 1986), 792 F.2d 7, 11-12, in which the court dismissed the RLEA's attempt to enjoin the sale of a railroad, finding that to do so would impinge on the plenary authority of the ICC to approve the sale in question. That case is distinguishable in that it involved the sale of a railroad pursuant to ICA section 10905, a forced sale provision requiring a financially ailing railroad to sell its assets as an alternative to abandonment. Since the

ICC order had directed the seller to complete the sale, the court concluded that an injunction could not be granted without modifying the mandatory order and that such an attack could be made only on direct appeal from the ICC order. (*Staten Island*, 792 F.2d at 12.) Plaintiffs here are not seeking to stop the sale of the railroad, or in other respects interfere with the need for a "nondivided authority over interstate commerce" (*Missouri Pacific R.R. Co. v. Stroud* (1925), 267 U.S. 404, 408, 69 L. Ed. 683, 685, 45 S. Ct. 242, 245), but to delay the transaction until it is determined whether it conforms to State fraudulent conveyance law.

In *Terry v. Atlas Van Lines, Inc.* (N.D. Ill. 1986), 679 F. Supp. 1467, an interstate carrier argued that it was exempt from the Illinois franchise disclosure act because the ICC had previously approved the acquisition of a majority of its stock and the franchise act improperly hindered the carriers' exercise of its franchise agreements. The court found that requiring compliance with the franchise act would not interfere with what the ICC authorized the carrier to do. (*Terry*, 679 F. Supp. at 1473.) As in *Terry*, plaintiffs' claims under the fraudulent conveyance act ultimately will not interfere with what the ICC authorized the railroads to do. I therefore conclude that the ICC's authorization of the sale does not remove the transaction from the application of State laws which do not conflict with the ICC's authority over national transportation policy.

The railroads in their brief also assert that plaintiffs have failed to plead a fraudulent conveyance and that the injunctive relief sought by plaintiffs would constitute an equitable attachment, which is prohibited by Illinois law under *Exchange National Bank v. Harris* (1984), 126 Ill. App. 3d 382, 386-88, 466 N.E.2d 1079. They argue that a conveyance by a solvent debtor who retains sufficient property to pay his debts will not be set aside as a fraudulent conveyance.

Illinois recognizes two types of fraudulent conveyance; those involving fraud in law, in which there is no consideration for the transfer (see, *e.g.*, *Gary-Wheaton Bank v. Meyer* (1984), 130 Ill. App. 3d 87, 94, 473 N.E.2d 548), and fraud in fact, which involves a conveyance supported by consideration but which is nonetheless intended to defraud or hinder creditors. (Ill. Rev. Stat. 1987, ch. 59, par. 4; *Alan Drey Co. v. Generation, Inc.* (1974), 22 Ill. App. 3d 611, 618, 317 N.E.2d 673.) Whether a debtor is solvent is only one consideration in determining whether there is fraud in fact. Other considerations include whether the conveyance is characterized by secrecy and whether the debtor is conveying previously unencumbered assets. (*Alan Drey*, 22 Ill. App. 3d at 618.) A plaintiff alleging fraud in fact must plead and prove a spe-

cific intent to defraud creditors. *Tcherepnin v. Franz* (N.D. Ill. 1979), 475 F. Supp. 92, 96.

Plaintiffs' complaint alleges that the sale was cloaked in secrecy, that the consideration was inadequate and that C&NW will use the proceeds of the sale to pay debts other than those owed to plaintiffs. Plaintiffs have also sufficiently alleged that they are creditors of C&NW. The term "creditors" as applied to the fraudulent conveyance act is liberally construed to encompass "all parties who have demands, accounts, interests or causes of action for which they might recover any debt, damages, penalty, or forfeiture," in actions in tort or contract. *Bongard v. Block* (1876), 81 Ill. 186, 187.

The injunctive relief sought by plaintiffs is authorized by section 4—101 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 4—101), which provides:

> "[A] creditor having a money claim, whether liquidated or unliquidated, and whether sounding in contract or tort, may have an attachment against the property of his or her debtor *** (8) Where the debtor is about fraudulently to conceal, assign, or otherwise dispose of [the] *** property or effects, so as to hinder or delay *** creditors."

*Exchange National Bank v. Harris* (1984), 126 Ill. App. 3d 382, 466 N.E.2d 1079, does not bar the injunctive relief sought by plaintiffs. *Harris* involved an "equitable attachment"; an impermissible attempt to attach funds that were not the funds in controversy in certain pending litigation and which would not be the subject of any final adjudication of the matter. (*Harris*, 126 Ill. App. 3d at 388.) The injunctive relief sought by plaintiffs here, however, is expressly permitted under section 4—101(8) (Ill. Rev. Stat. 1987, ch. 110, par. 4—101(8)).

The majority also concludes that plaintiffs' civil conspiracy claim is preempted under the authority of *Bartley v. University Asphalt Co.* (1986), 111 Ill. 2d 318, 489 N.E.2d 1367. *Bartley* held that a plaintiff's Illinois tort claims for retaliatory discharge and civil conspiracy were preempted by section 301 of the LMRA. Relying on *Allis-Chalmers v. Lueck* (1985), 471 U.S. 202, 220, 85 L. Ed. 2d 206, 221, 105 S. Ct. 1904, 1915, the court in *Bartley* noted that the plaintiff's cause of action for civil conspiracy was substantially dependant upon analysis of the terms of the collective-bargaining agreement, in that the plaintiff had alleged the existence of the agreement, the violation of the terms of the agreement, a conspiracy to violate the agreement, and a breach of the duty to represent plaintiff adequately during proceedings established by the collective-bargaining agreement. The court's finding that the civil conspiracy claim was preempted was based on its determina-

tion that the claim was "inextricably intertwined with consideration of the terms of the labor contract." (*Allis-Chalmers*, 471 U.S. at 213, 85 L. Ed. 2d at 216, 105 S. Ct. at 1912.) Plaintiffs' allegations here, in contrast, do not hinge on the existence of a collective-bargaining agreement, nor do they allege the violation of the agreement. Plaintiffs' conspiracy claim addresses the alleged intent of the railroads to defraud plaintiffs by converting equity into debt, the proceeds of which will be channeled to various shareholders and other creditors. The analysis of plaintiffs' civil conspiracy claim requires neither recourse to nor interpretation of the collective-bargaining agreement. In light of *Lingle*, I conclude that plaintiffs' civil conspiracy claim is not preempted by Federal labor law.

For the foregoing reasons, I respectfully dissent.